**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GREGORY SAMMONS, Derivatively and on Behalf of HUMACYTE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN SEBELIUS, JOHN BAMFORTH, EMERY N. BROWN, MICHAEL T. CONSTANTINO, BRADY W. DOUGAN, C. BRUCE GREEN, KEITH ANTHONY JONES, LAURA E. NIKLASON, TODD M. POPE, DIANE SEIMETZ, MAX WALLACE, SUSAN WINDHAM-BANNISTER, DALE A. SANDER, HEATHER PRICHARD<br><br>Defendants,<br><br>and<br><br>HUMACYTE, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Gregory Sammons ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Humacyte, Inc. ("Humacyte" or the "Company"), files this Stockholder Shareholder Derivative Complaint against Kathleen Sebelius, John Bamforth, Emery N. Brown, Michael T. Constantino, Brady W. Dougan, C. Bruce Green, Keith Anthony Jones, Laura E. Niklason, Todd M. Pope, Diane Seimetz, Max Wallace, Susan Windham-Bannister, Dale A. Sander, and Heather Prichard (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Humacyte.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to herself and her acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Humacyte, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Middle District of North Carolina captioned *In Re Humacyte,, Inc. Securities Litigation*, 1:24-cv-00954-TDS-JEP (M.D.N.C) (the "Securities Class Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Humacyte against certain of its officers and directors (the "Board") seeking to remedy Defendants' violations of law that have occurred from August 14, 2023 through at least March 25, 2025 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Humacyte and its shareholders, including monetary losses and damages to Humacyte's reputation and goodwill.

2. Between at least April 29, 2024 and March 25, 2025 (the "Relevant Period"), the Individual Defendants knowingly and/or recklessly permitted the dissemination of materially false and misleading statements and omissions and caused the Company to maintain inadequate disclosure controls and procedures as well as deficient internal controls.

3. The Individual Defendants repeatedly disregarded warning signs and failed to timely implement appropriate compliance measures and internal control mechanisms necessary to

ensure adherence to applicable legal and regulatory requirements. They consciously ignored, or recklessly failed to recognize, significant deficiencies in the Company's internal controls, policies, and procedures, and did not undertake a good-faith effort to remedy those deficiencies or prevent their recurrence.

4. As set forth herein, the Individual Defendants were aware, or should have been aware, of substantial risks that Humacyte was violating applicable laws or facing significant corporate harm, yet failed to take appropriate corrective action. Despite having multiple opportunities to address the Company's compliance failures, reporting deficiencies, and inadequate information controls, the Individual Defendants failed to do so. By neglecting to establish and oversee an effective compliance and reporting system and by consciously disregarding red flags requiring investigation, the Individual Defendants breached their duties of care and loyalty owed to the Company and its stockholders.

5. Humacyte, together with its subsidiaries, operates as a medical technology and regenerative medicine company focused on the development and manufacture of bioengineered, implantable human tissue products. The Company's principal product candidate is the Acellular Tissue Engineered Vessel ("ATEV"), also referred to as the Human Acellular Vessel ("HAV"). ATEV is a laboratory-grown vascular implant designed to replace or bypass injured or damaged blood vessels.

6. In December 2023, Humacyte submitted a Biologics License Application ("BLA") to the Food and Drug Administration ("FDA") seeking approval for the use of ATEV in urgent arterial repair following extremity vascular trauma where the use of either a synthetic graft or autologous vein is not feasible. In February 2024, the FDA granted Priority Review status to the application and assigned a Prescription Drug User Fee Act ("PDUFA") target action date of

August 10, 2024.

7. On August 9, 2024, after the close of trading, Humacyte issued a press release stating that the FDA "will require additional time to complete its review of its Biologic License Application (BLA) for the acellular tissue engineered vessel (ATEV) in the vascular trauma indication." The release further disclosed that, "[d]uring the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing[.]" Following this announcement, Humacyte's stock price fell by $1.29 per share, or 16.4%, closing at $6.62 per share on August 12, 2024.

8. Thereafter, on October 17, 2024, during market hours, the FDA published a Form 483 concerning the Company's facility in Durham, North Carolina. The Form 483 identified multiple deficiencies, including "no microbial quality assurance," "no microbial testing," and inadequate "quality oversight." In response to this disclosure, the Company's stock price again declined by $0.95 per share, or 16.35%, to close at $4.86 per share on October 17, 2024.

9. Throughout the Relevant Period, the Individual Defendants knowingly or recklessly made, or caused Humacyte to make, materially false and misleading statements and omissions to investors by failing to disclose, among other things: (i) that the HAV had serious health and safety issues, including the risk of rupture and flaws in the studies; and (ii) that, as a result, Defendants' positive statements concerning Humacyte's business, operations, and future prospects were materially misleading and lacked a reasonable basis. These misrepresentations misled investors and artificially inflated the market price of Humacyte's stock.

10. The Individual Defendants further breached their fiduciary obligations by causing Humacyte to issue and sell Company securities at prices allegedly inflated by the misstatements

described herein. Specifically, on October 4, 2024, Humacyte announced that it had entered into a securities purchase agreement with an institutional investor providing for the purchase of approximately $30.0 million of the Company's common stock and warrants in a registered direct offering scheduled to close on October 7, 2024. The Company subsequently entered into a similar agreement on November 14, 2024 to sell approximately $15.0 million of common stock to another institutional investor, with the transaction closing the following day, just two days before the FDA's announcement and the resulting decline in the Company's stock price.

11. Additionally, while Humacyte's stock allegedly traded at artificially inflated levels as a result of the misrepresentations described herein, certain Individual Defendants sold Company shares while in possession of material non-public information ("MNPI"). Further, Ayabudge LLC ("Ayabudge"), an entity controlled by Defendant Dougan, who is married to former Chief Executive Officer ("CEO") and President, Defendant Niklason, disposed of millions of shares and realized millions of dollars in proceeds.

12. As a consequence of the Individual Defendants' knowing or reckless breaches of fiduciary duty and related misconduct, the Company has suffered substantial harm. A federal securities class action was subsequently filed in the United States District Court for the Middle District of North Carolina against Humacyte and several of the Individual Defendants, exposing the Company to significant potential class-wide liability (the "Securities Class Action"). On March 31, 2026, the Honorable Thomas D. Schroeder issued an order denying in part defendants' Motion to Dismiss in the Securities Class Action (the "Order"). *See In re Humacyte, Inc. Sec. Litig.*, No. 1:24-cv-00954-TDS-JEP (M.D.N.C. Mar. 31, 2026) (order granting in part and denying in part motion to dismiss), ECF No. 52.

13. Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of Humacyte, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Class Action, a majority of Humacyte's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.142-9) promulgated thereunder by the SEC.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

16. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18. This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

19. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## PARTIES

***Plaintiff***

20. Plaintiff is, and has been at all relevant times, a shareholder of Humacyte.

***Nominal Defendant***

21. Nominal Defendant Humacyte is incorporated under the laws of Delaware, with its principal executive office located at 2525 East North Carolina Highway 54, Durham, North Carolina, 27713. Humacyte was formed from a special purpose acquisition ("SPAC") merger between Humacyte, Inc. ("Legacy Humacyte") and Alpha Healthcare Acquisition Corp. ("AHAC") on August 26, 2021 (the "Merger"). Humacyte common stock trades on the NASDAQ under the ticker symbol "HUMA".

***Individual Defendants[1]***

22. Defendant John Bamforth ("Bamforth") has served as a director of Humacyte since June 2024. Bamforth is a member of the Company's Commercial Committee. According to Humacyte's Proxy Statement filed with the SEC on April 29, 2025 (the "2025 Proxy"), Defendant Bamforth received $449,247 in total compensation from the Company in 2024.

23. The Company's most recent Proxy Statement, filed with the SEC on April 28, 2026 (the "2026 Proxy") stated, in part, the following about Defendant Bamforth:

> ***John P. Bamforth*** has served as a member of our Board since 2024. Dr. Bamforth served as Executive Director of Eshelman Innovation, a translational innovation institute at the University of North Carolina–Chapel Hill, from October

[1] Defendants Sebelius, Bamforth, Brown, Constantino, Dougan, Green, Jones, Niklason, Pope, Seimetz, Wallace and Windham-Bannister are herein referred to as the "Director Defendants."

2019 to July 2025. Prior to joining Eshelman Innovation, Dr. Bamforth spent 30 years at Eli Lilly and Company ("Lilly") until his retirement in 2018, in an array of roles primarily focused on brand development and commercialization. In 2012, he was appointed Chief Marketing Officer for Lilly's multi-billion-dollar U.S. business and in 2016 he became Chief Marketing Officer for Lilly's global business. Dr. Bamforth currently sits on the board of directors of READDI (Rapidly Emerging Antiviral Drug Development Initiative), a global non-profit developing small molecule antiviral drugs for pandemics, Akancocure, a private biotechnology company, and Eshelman Innovation. He has acted as a strategic advisor to Cape Fear BioCapital since August 2025. Between 2019 and 2021, Dr. Bamforth also served on the board of directors of the Structural Genomic Consortium (SGC), a public-private partnership exploring the human genome for novel biological targets of disease. In 2017, Dr. Bamforth co-founded B and M Impact Foundation dedicated to enabling disadvantaged youth to attend college. Dr. Bamforth holds a BPharm from the University of Bath and a Ph.D. and D.Sc. (Hon.) from Aston University in England.

We believe that Dr. Bamforth is qualified to serve as a director based on his extensive scientific and pharmaceutical management experience.

24. Defendant Emery Brown ("Brown") has served as a director of Humacyte since August of 2021. Brown is a member of the Company's Nominating and Governance Committee. According to Humacyte's 2025 Proxy, Brown received $331,000 in total compensation from the Company in 2024.

25. The Company's 2026 Proxy stated, in part, the following about Defendant Brown:

***Emery N. Brown*** has served as a member of our Board since August 2021. Dr. Brown currently serves as the Warren M. Zapol Professor of Anaesthesia at Harvard Medical School and the Edward Hood Taplin Professor of Medical Engineering and Computational Neuroscience at the Massachusetts Institute of Technology. He has been on the faculty at Harvard Medical School and MIT since May 1992 and October 2005, respectively. Dr. Brown has also served as an anesthesiologist at Massachusetts General Hospital from May 1992 to May 2022. Dr. Brown is an editor of PNAS and a member of the Editorial Advisory Committee of the New England Journal of Medicine. Dr. Brown currently serves on the Board of Trustees of the Guggenheim Foundation, the Board of Trustees of the Simons Foundation, and the board of directors of PASCALL Systems, Inc., an early-stage medical device startup which he co-founded. Dr. Brown is a member of the National Academy of Inventors, the American Philosophical Society, the National Academy of Medicine, the National Academy of Sciences and the National Academy of Engineering. Dr. Brown is a recipient of the National Medal of Science. Dr. Brown holds an M.D. from Harvard Medical School, a Ph.D. and M.A. in statistics from Harvard University and a B.A. in applied mathematics from Harvard

> College.
>
> We believe that Dr. Brown is qualified to serve as a director based on his extensive medical and scientific knowledge and experience.

26. Defendant Michael Constantino ("Constantino") has served as a director of Humacyte since August of 2021. Constantino has served as Chair of the Audit Committee since at least April of 2022. According to Humacyte's 2025 Proxy, Constantio received $338,500 in total compensation from the Company in 2024.

27. The Company's 2026 Proxy stated, in part, the following about Defendant Constantino:

> ***Michael T. Constantino*** has served as a member of our Board since August 2021. Mr. Constantino is a retired Ernst & Young LLP assurance partner who served in the Research Triangle Park region of North Carolina for over 30 years. From 2009 to 2012, he served as the Office Managing Partner for the combined Raleigh/Greensboro office of Ernst & Young. Mr. Constantino served as a member of the board and the chairman of the audit committee of 9 Meters Biopharma, Inc., a clinical-stage biopharmaceutical company. He also served on the advisory board for CREO, Inc., an RTP-based consultancy focused on growth management and data transformation services, and served as chair of the board for the NC State Foundation. Mr. Constantino holds a B.A. in both Accounting and Business Management from NC State University and is a North Carolina Certified Public Accountant, or CPA.
>
> We believe that Mr. Constantino is qualified to serve as a director based on his extensive experience as a CPA and with SEC compliance matters and Sarbanes-Oxley internal control over financial reporting.

28. Defendant Brady Dougan ("Dougan") has served as a director of Humacyte since August of 2021. Previously, Dougan served on the Board of Legacy Humacyte from 2005, and as its Chair from March 2019 to August 2021. According to Humacyte's 2025 Proxy, Dougan received $331,000 in total compensation from the Company in 2024.

29. The Company's 2026 Proxy stated, in part, the following about Defendant Dougan:

> ***Brady W. Dougan*** has served as a member of our Board since August 2021. He previously served as the chair of the board of directors of Legacy

Humacyte from March 2019 to August 2021 and as a member of its board of directors since 2005. Since July 2015, Mr. Dougan has served as Chairman and Chief Executive Officer of Exos Securities ("Exos"). From May 2007 through June 2015, Mr. Dougan served as Chief Executive Officer and Member of the Executive Board of Credit Suisse Group AG and Credit Suisse AG, steering the bank through the financial crisis of 2008 and various reforms and changes in the banking industry. Prior to that time, Mr. Dougan served in various leadership positions at Credit Suisse. Mr. Dougan currently serves on the Board of Trustees for the University of Chicago. Mr. Dougan holds a B.A. in Economics and an M.B.A. in Finance from the University of Chicago. Mr. Dougan is married to Laura E. Niklason, Humacyte's President and Chief Executive Officer and a member of our Board.

We believe that Mr. Dougan is qualified to serve as a director based on his significant executive leadership experience and his extensive experience related to financing for public and private companies.

30. During the Relevant Period, Defendant Dougan sold over 8.2 million shares of Company stock for almost $39 million in proceeds through relevant non-party Ayabudge LLC ("Ayabudge"), an entity controlled by Dougan. Dougan also sold additional shares in a private transaction to a trust controlled by his wife, Defendant Niklason. Those sales are reflected below:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/31/24 | 716,573 | $7.78 | $5,574,937.94 |
| 5/31/24 | 93,213 | $8.93 | $832,392.09 |
| 6/3/24 | 190,214 | $7.42 | $1,411,387.88 |
| 6/4/24 | 1,852 | $7.28 | $13,482.56 |
| 6/11/24 | 282,000 | $7.10 | $2,000,000.40 |
| 6/11/24 | 76,630 | $7.02 | $537,942.60 |
| 6/12/24 | 271,518 | $7.03 | $1,982,081.40 |
| 8/27/24 | 252,676 | $6.71 | $1,695,455.96 |
| 8/28/24 | 277,090 | $6.47 | $1,792,772.30 |
| 8/29/24 | 352,112 | $6.35 | $2,235,911.20 |
| 9/9/24 | 157,704 | $5.42 | $854,755.68 |
| 9/10/24 | 288,674 | $5.23 | $1,509,765.02 |
| 11/18/24 | 811,172 | $4.44 | $3,601,603.68 |
| 11/19/24 | 427,459 | $4.34 | $1,855,172.06 |
| 11/20/24 | 261,369 | $4.40 | $1,150,023.60 |
| **Total** | **8,259,852** | | **$38,986,521.49** |

31. Pursuant to the Company's filings with the SEC, Defendant Dougan is not considered an independent Director.

32. Defendant C. Bruce Green ("Green") has served as a director of Humacyte since September 2022. He is a member of the Commercial Committee and was at all relevant times. According to Humacyte's 2025 Proxy, Green received $331,000 in total compensation from the Company in 2024.

33. The Company's 2026 Proxy stated, in part, the following about Defendant Green:

> ***C. Bruce Green*** has served as a member of our Board since 2022. Dr. Green served as the 20th Surgeon General of the U.S. Air Force from August 2009 through July 2012, during which time he oversaw all U.S. Air Force Medical Service activities, including a staff of over 42,800 people assigned to 75 medical facilities worldwide. Prior to serving as Surgeon General, Dr. Green served as Assistant Surgeon General for Health Care Operations from July 2005 to August 2006 and Deputy Surgeon General of the U.S. Air Force from August 2006 to August 2009. Dr. Green was commissioned through the Health Professions Scholarship Program and entered active duty with the U.S. Air Force in 1978. After 34 years of service, he retired from the Air Force in July 2012 with the rank of Lieutenant General. Dr. Green served as Director and Chief Medical Officer of Deloitte Federal Consulting from October 2013 until his retirement in 2022. Dr. Green completed residency training in family practice at Eglin Regional Hospital, Eglin Air Force Base, Florida, and in aerospace medicine at Brooks Air Force Base, Texas. He received his B.S. from the University of Wisconsin–Parkside, his M.D. from the Medical College of Wisconsin and his M.P.H. from the Harvard School of Public Health.
>
> We believe that Dr. Green is qualified to serve as a director based on his extensive healthcare management experience derived from his distinguished career and leadership positions with the U.S. Air Force Medical Service.

34. Defendant Keith Anthony Jones ("Jones") has served as a director of Humacyte since June of 2024. He is a member of the Commercial Committee and was at all relevant times. According to Humacyte's 2025 Proxy, Jones received $449,247 in total compensation from the Company in 2024.

35. The Company's 2026 Proxy stated, in part, the following about Defendant Jones:

> ***Keith Anthony Jones*** has served as a member of our Board since 2024.

> Dr. Jones served as the Chief Physician Executive of the University of Alabama at Birmingham ("UAB") Health System as well as the Senior Associate Dean for Clinical Affairs of the UAB Heersink School of Medicine ("UABHSOM"), and the President of the University of Alabama Health Services Foundation (the "UAHSF") from 2017 until May 2024. The UAHSF is the Faculty Practice Plan for the UABHSOM and employs approximately 1,400 academic physicians. Dr. Jones also served as the Maurice S. Albin Professor of Anesthesiology and Perioperative Medicine at the UABHSOM from 2019 until May 2024. From 2006 to 2017, Dr. Jones served as Chair of the Department of Anesthesiology and Perioperative Medicine for the UABHSOM and Chief of Anesthesiology Services for UAB Hospital. He is a member of the American Society of Anesthesiologists, where he has served on and led numerous committees. Dr. Jones holds a B.S. in microbiology and an M.D. from the University of Alabama and completed his residency and postdoctoral fellowship at the Mayo Graduate School of Medicine.
>
> We believe that Dr. Jones is qualified to serve as a director based on his extensive medical expertise and administrative experience in the UAB Health System.

36. Defendant Laura Niklason ("Niklason") has served as President, CEO, and as a director of Humacyte since August 2021. She founded Legacy Humacyte and served as its President and CEO from November 2020 until the Merger and as a director of the Company from 2004 until the Merger. Niklason is married to Defendant Dougan. She is also named as a defendant in the Securities Class Action. According to Humacyte's 2025 Proxy, Niklason received $905,436 in total compensation from the Company in 2024.

37. The Company's 2026 Proxy stated, in part, the following about Defendant Niklason:

> ***Laura E. Niklason*** is the founder of Legacy Humacyte. Dr. Niklason has served as our President and Chief Executive Officer and as a member of the Board since August 2021, and previously served as President and Chief Executive Officer of Legacy Humacyte since November 2020 and as a member of the Legacy Humacyte board of directors since 2004. Dr. Niklason has served in a senior scientist capacity at the Company from 2005 through 2020. Dr. Niklason has served as an adjunct professor at Yale University since November 2020 and previously served as the Nicholas M. Greene Professor of Anesthesiology and Biomedical Engineering at Yale University from 2006 to November 2020. She was inducted into the National Academy of Inventors in 2014 and was elected to the National Academy of Medicine and the National Academy of Engineering in 2015 and 2020, respectively. Dr. Niklason holds a Ph.D. in Biophysics from the University of Chicago and an M.D. from the University of Michigan. Dr. Niklason completed her residency training in anesthesia and intensive care unit medicine at the

> Massachusetts General Hospital and completed post-doctoral scientific training at the Massachusetts Institute of Technology. Dr. Niklason is married to Mr. Dougan, a member of the Board.
>
> We believe that Dr. Niklason is qualified to serve as a director based on her significant experience in the biotechnology industry, her extensive training in medicine and science and her role as the founder of Legacy Humacyte.

38. Defendant Todd Pope ("Pope") served as a director of Humacyte from August 2021 until June 2026. He served as a member of the Commercial Committee at all relevant times. According to Humacyte's 2025 Proxy, Pope received $336,000 in total compensation from the Company in 2024.

39. The Company's 2026 Proxy stated, in part, the following about Defendant Pope:

> ***Todd M. Pope*** has served as a member of our Board since August 2021. Mr. Pope has been a partner of Revival Healthcare Capital since October 2022. Mr. Pope previously served as the President and Chief Executive Officer of WellAir Group Ltd., a leading clean air solutions company from February 2021 until March 2022. Prior to its acquisition by WellAir, Mr. Pope served as the Executive Chairman of UV Innovators, LLC, a developer of medical-grade handheld UVC disinfection technology, from February 2017 to February 2021. From 2008 to 2019, Mr. Pope served as the Chief Executive Officer of TransEnterix, Inc. (now Asensus Surgical, Inc.), a medical device company. He also previously served as worldwide president of Cordis, a multi-billion-dollar division within Johnson & Johnson's medical device business. Mr. Pope currently serves on, and previously served as the chairman of, the board of directors of AdvaMed ACCEL, a medical technology industry group, the chairman of the board of Avania, a private medtech CRO, and a director of Distalmotion, a private Swiss robotics company. Mr. Pope also serves on the Educational Foundation for the University of North Carolina at Chapel Hill, where he is the immediate past executive chairman of the board. Time Magazine named Mr. Pope one of the "50 most influential people in healthcare 2018." Mr. Pope holds a B.A. in Labor and Industrial Relations from the University of North Carolina.
>
> We believe that Mr. Pope's extensive experience in key leadership positions at public and private companies within the healthcare industry has provided him with executive leadership, finance, strategic, risk management, commercialization and scientific expertise. On March 26, 2026, Todd M. Pope notified the Company that he intends not to stand for re-election at the Annual Meeting.

40. Defendant Heather Prichard ("Prichard") served as Chief Operating Officer ("COO") of Humacyte from August 2021 until June 2025. Previously, she had served various

roles at Legacy Humacyte beginning in 2008. Prichard is named as a defendant in Securities Class Action. According to Humacyte's 2025 Proxy, Prichard received $653,205 in total compensation from the Company in 2024.

41. During the Relevant Period, Defendant Prichard sold over 191,511 shares of Company stock for more than $1.5 million in proceeds. Those sales are reflected below:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/30/24 | 61,941 | $7.71 | $477,565.11 |
| 5/30/24 | 78,779 | $8.36 | $658,592.44 |
| 5/30/24 | 48,166 | $8.32 | $400,741.12 |
| 5/31/24 | 2,625 | $9.41 | $24,706.50 |
| **Total** | **191,511** | | **$1,561,605.17** |

42. Defendant Dale Sander ("Sander") has served as Chief Financial Officer ("CFO"), Chief Corporate Development Officer, and Treasurer of Humacyte since May 2021. He served various roles at Legacy Humacyte from 2015 until the Merger. Sander is named as a defendant in Securities Class Action. According to Humacyte's 2025 Proxy, Sander received $704,189 in total compensation from the Company in 2024.

43. During the Relevant Period, Defendant Sander sold 39,389 shares of Company stock for more than $263,000 in proceeds. Those sales are reflected below:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/27/24 | 39,389 | $6.68 | $263,118.52 |
| **Total** | **39,389** | | **$263,118.52** |

44. Defendant Kathleen Sebelius ("Sebelius") has served as a director of Humacyte since August 2021 and as Chair of the Board of Directors throughout the Relevant Period. She is a member of the Audit Committee and was at all relevant times. She was a member of Legacy Humacyte's board from September 2015 until the Merger. According to Humacyte's 2025 Proxy, Sebelius received $356,000 in total compensation from the Company in 2024.

45. The Company's 2026 Proxy stated, in part, the following about Defendant Sebelius:

> ***Kathleen Sebelius*** is the chair of our Board. She has served as a member of our Board since August 2021 and previously served as a member of Humacyte Global, Inc. ("Legacy Humacyte") board of directors from September 2015 to August 2021. Ms. Sebelius is the Chief Executive Officer of Sebelius Resources LLC, which provides strategic advice to private companies, not-for-profit organizations, higher education institutions and financial investors. From April 2009 to June 2014, Ms. Sebelius served as U.S. Secretary of Health and Human Services ("HHS"). Prior to serving as HHS Secretary, Ms. Sebelius was the Governor of Kansas and served two terms as the Kansas insurance commissioner and four terms in the Kansas Legislature. Ms. Sebelius currently serves on the board of directors of Devoted Health, Inc., Included Health Inc. and Exact Sciences Corporation. She also serves as a director of KFF (formerly the Kaiser Family Foundation) and Project 50. Ms. Sebelius co-chairs the Aspen Institute Health Strategy Group and serves on advisory boards for the Dole Institute of Politics, Out Leadership, and the Estée Lauder Foundation. Ms. Sebelius holds a master of public administration degree from the University of Kansas and a B.A. in Political Science from Trinity Washington University.
>
> We believe that Ms. Sebelius' distinguished leadership in the healthcare reimbursement industry, tenure in the public sector and experience with regulatory process and policies provides her with executive leadership, strategic, regulatory, talent management, reimbursement and policy expertise.

46. During the Relevant Period, Defendant Sebelius sold 5,182 shares of Company stock for more than $28,000 in proceeds. Those sales are reflected below:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 9/10/24 | 3,634 | $5.41 | $19,659.94 |
| 9/10/24 | 1,548 | $5.39 | $8,343.72 |
| **Total** | **5,182** | | **$28,003.66** |

47. Pursuant to the Company's filings with the SEC, Defendant Sebelius is not considered an independent Director.

48. Defendant Diane Seimetz ("Seimetz") has served as a director of Humacyte since June 2022. She is a member of the Commercial Committee and was at all relevant times. According to Humacyte's 2025 Proxy, Seimetz received $331,000 in total compensation from the Company in 2024.

49. The Company's 2026 Proxy stated, in part, the following about Defendant Seimetz:

> ***Diane Seimetz*** has served as a member of our Board since 2022. Dr. Seimetz has over 25 years of international drug development, partnering and managerial experience in the biopharmaceutical industry. In 2013, she co-founded Biopharma Excellence and served as its Chief Executive Officer from December 2013 until June 2021. Biopharma Excellence was acquired by the PharmaLex Group in September 2020, and is now part of Cencora. Dr. Seimetz currently serves on the board of directors of Cumulus Oncology, GlycanAGE, Temedica and mbiomics. She is part of the scientific advisory board of the quadraScope fund. In 2023, she co-founded two biotech companies, Avocet Bio and Myopax. Dr. Seimetz began her professional career in 1999 with the Fresenius Healthcare Group and served as Executive Vice President of its biotech division and Chief Scientific Officer with responsibility for international drug development from 2008 to 2013. Dr. Seimetz received a degree in pharmaceutical science from the University of Saarland, a master's degree in drug regulatory affairs from the University of Bonn, and a Ph.D. from the University of Heidelberg, for which her research work was conducted at the German Cancer Research Center and Johns Hopkins University.
>
> We believe that Dr. Seimetz is qualified to serve as a director based on her extensive experience in international drug development, partnering and managerial experience in the biopharmaceutical industry.

50. Defendant Max Wallace ("Wallace") has served as a director of Humacyte since August 2021. He was a member of Legacy Humacyte's board from June 2005 until the Merger According to Humacyte's 2025 Proxy, Wallace received $336,000 in total compensation from the Company in 2024.

51. The Company's 2026 Proxy stated, in part, the following about Defendant Wallace:

> ***Max Wallace*** has served as a member of our Board since August 2021 and previously served as a member of the Legacy Humacyte board of directors from June 2005 to August 2021. Mr. Wallace has served as the President of Round Table Research, a cancer research company, since March 2023. Mr. Wallace served as Chief Executive Officer of Accelerate Brain Cancer Cure, or $ABC^2$, a not-for-profit corporation seeking to drive research and treatments for brain tumors from August 2008 to December 2019. Prior to joining $ABC^2$, Mr. Wallace served as the Chief Executive Officer of TheraLogics, Inc. an early-stage biopharmaceutical company, and as President of Trimeris, Inc., a formerly public biopharmaceutical company founded by Mr. Wallace that created and brought to market a new class of drugs for the treatment of HIV, AIDS and other viral diseases and is now a part of Synageva BioPharma Corp. Mr. Wallace also founded and developed several other biopharmaceutical companies, including Cogent Neuroscience, Sphinx Pharmaceuticals Corporation, now a part of Lilly, and SARCO, Inc., now a part of

> PPD/Pharmaco, and co-founded and served as President of the North Carolina Bioscience Organization, the biotechnology industry's trade organization in North Carolina. Mr. Wallace holds a B.A. in English and Political Science from Duke University and a J.D. from the University of Florida.
>
> We believe that Mr. Wallace is qualified to serve as a director based on the depth of his experience in the biotechnology industry, including his service in executive roles at multiple emerging biopharmaceutical companies and his oversight of the development and commercialization of innovative technologies.

52. Defendant Susan Windham-Bannister ("Windham-Bannister") has served as a director of Humacyte since August 2021. She serves as Chair of the Commercial Committee and sits on the Audit Committee and has at all relevant times. According to Humacyte's 2025 Proxy, Windham-Bannister received $331,000 in total compensation from the Company in 2024.

53. The Company's 2026 Proxy stated, in part, the following about Defendant Windham-Bannister:

> ***Susan Windham-Bannister*** has served as a member of our Board since August 2021. Dr. Windham-Bannister is a nationally and internationally recognized expert in biopharma innovation, market access and market optimization strategies. She has served as President and Chief Executive Officer of Biomedical Growth Strategies, LLC, a strategic advisory firm serving the life sciences and healthcare industries, since September 2015. During her career as a strategy consultant, she has crafted the launch strategies for numerous "block buster" drugs, biologics and diagnostics. From 2008 to 2015, Dr. Windham-Bannister served as founding President and Chief Executive Officer of the Massachusetts Life Sciences Initiative, a $1 billion life sciences dedicated investment fund. Dr. Windham-Bannister currently serves on the board of directors of Aridis Pharmaceuticals, Inc., a public late-stage biopharmaceutical company and on the advisory boards of the Paris Saclay Cancer Center and Brockton Everlast, a London-based firm. She is the board chair of BioscienceLA, a nonprofit independent innovation catalyst in Los Angeles. Dr. Windham-Bannister holds a Ph.D. in Health Policy and Management from the Florence Heller School at Brandeis University. She was a Post-Doctoral Fellow at Harvard University's John F. Kennedy School and a Fellow in the Center for Science and Policy (CSAP) at Cambridge University, Cambridge, England.
>
> We believe that Dr. Windham-Bannister is qualified to serve as a director based on her status as an internationally recognized expert in innovation, market access, and market optimization strategies.

54. During the Relevant Period, the Individual Defendants were actively engaged in managing the Company's operations at the highest levels and had access to confidential and

proprietary information related to the Company's business, operations, services, markets, competition, sales, demand, backlog, and future business prospects. They also participated in drafting, producing, reviewing, and disseminating the allegedly false and misleading statements detailed herein. Furthermore, they were either aware of or recklessly disregarded the inaccuracies and misrepresentations made about the Company through public statements, representations, and filings and either approved or ratified these statements actively, or through inaction, thereby violating the federal securities laws.

55. As officers and controlling persons of a publicly traded company whose securities are registered with the SEC under the Exchange Act and listed on the Nasdaq, the Individual Defendants had a duty to promptly disclose truthful, accurate, and complete information regarding the Company's business, operations, services, markets, competition, sales, demand, backlog, and current and future business prospects. They were also obligated to correct any prior statements that were materially false or misleading to ensure that the market price of the Company's publicly traded shares reflected truthful, accurate and complete information. The Individual Defendants' false and misleading representations and omissions during the Relevant Period constituted a violation of these specific duties and obligations under federal securities laws.

56. The Individual Defendants, by virtue of their positions of control and authority as officers and directors of the Company, exercised control over the content of the Company's SEC filings, press releases, and other public statements issued during the Relevant Period. Each Individual Defendant received copies of the documents alleged to be false and misleading before or shortly after their publication and had the ability and opportunity to prevent their issuance or ensure their correction. As a result, each Individual Defendant bears responsibility for the

accuracy of the public statements described herein and is therefore primarily liable for the representations contained within them.

***Relevant Non-Parties***

57. Ayabudge is a limited liability company controlled by Defendant Dougan. Dougan sold Company stock through Ayubudge during the Relevant Period.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58. By reason of their positions as officers, directors, and/or fiduciaries of Humacyte, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Humacyte and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

59. The Individual Defendants were and are required to use their utmost ability to control and manage Humacyte in a fair, just, honest, and equitable manner.

60. The Individual Defendants were and are required to act in furtherance of the best interests of Humacyte and its shareholders to benefit all shareholders equitably.

61. Each director and officer of the Company owes Humacyte and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

62. As fiduciaries of Humacyte, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

63. The officers and directors of Humacyte were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

64. Each Individual Defendant under their position as officers and directors of Humacyte owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

65. As Humacyte's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

66. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

67. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

68. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

(a) Ensure the Company's affairs were managed efficiently and in a business-like manner to achieve the highest quality performance;

(b) Ensure the Company operated diligently, honestly, and prudently, in full compliance with all applicable district and state laws, rules, regulations, and contractual obligations, and acted strictly within its legal authority;

(c) Ensure that communications with the public and shareholders were timely, complete, and made with candor; and

(d) Upon notice of issues concerning the Company's business practices or operations, act in good faith to take appropriate measures to correct the misconduct and prevent its recurrence.

69. Each of the Individual Defendants also bore a duty of loyalty to Humacyte and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

70. During the pertinent times, the Individual Defendants served as agents for each other and for Humacyte, always operating within the parameters of their agency.

71. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Humacyte, were privy to detrimental, confidential information concerning the Company.

## CODE OF BUSINESS CONDUCT AND ETHICS

72. In addition to the fiduciary duties numerated above, the Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Humacyte's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states, in pertinent part, the following:

> Our reputation for honesty and integrity is key to the success of our business. The Company intends that its business practices will comply with the laws of all of the jurisdictions in which it operates and that honesty, integrity and accountability will always characterize the Company's business activity. No employee, officer or director may achieve results through violations of laws or regulations or unscrupulous dealings.
>
> This Code of Conduct and Ethics (the "**Code**") reflects the Company's commitment to a culture of honesty, integrity and accountability and outlines the basic principles and policies with which all employees, officers and directors are expected to comply. Therefore, we expect you to read this Code thoroughly and carefully.

In addition to following this Code in all aspects of your business activities, you are expected to seek guidance in any situation where there is a question regarding compliance issues, whether with the letter or the spirit of the Company's policies and applicable laws. Compliance with this Code is essential to the continued success of the Company's business and the cultivation and maintenance of its reputation as a good corporate citizen. Misconduct is never justified, even where sanctioned or ordered by an officer or other individual in a position of higher management. No individual, regardless of stature or position, can authorize actions that are illegal, or that jeopardize or violate Company standards.

73. The Conflict of Interest section of the Code specifies:

A conflict of interest exists when private interests, including personal, family, social, or financial interests, interfere in any way with the performance of your responsibilities with respect to the Company. A conflict can arise if you, or an immediate family member, takes actions that can make it difficult for you to perform Company duties objectively, or if you receive personal benefits that are, or appear to be, improper. For example, conflicts of interest may arise if:

- you cause the Company to engage in business transactions with a company that you, your friends or your relatives control without having obtained any required prior approvals;
- you are in a position to (i) compete with, rather than help, the Company or (ii) make a business decision not on the basis of the Company's interest but rather for your own personal advantage;
- you take actions, or have personal or family interests, that may make it difficult to perform your work (or discharge your duties and obligations) effectively; or
- you, or any of your family members or affiliates, receive improper personal benefits as a result of your position in the Company.

You are required to act in the Company's best interest and to exercise sound judgment, free from personal interests or other loyalties and to refrain from activity that causes an actual or potential conflict of interest in violation of the Humacyte Conflicts of Interest Policy. Any actual or potential conflicts of interest must be reported promptly to the Chief Financial Officer (the "**Determining Officer**"). Further, if you become aware of a conflict or potential conflict involving another employee, officer or director, you should bring it to the attention of the Determining Officer.

74. Under the Corporate Opportunities section, the Code specifies:

When carrying out your duties or responsibilities, you owe a duty to the Company to advance its legitimate interests. Each employee, officer and director is prohibited from:

- diverting to himself or herself or to others any opportunities that are discovered through the use of the Company's property or information or as a result of his or her position with the Company unless such opportunity has first been presented to, and rejected by, the Company;
- using the Company's property or information or his or her position for improper personal gain; or
- competing with the Company.

75. Under Public Reporting, the Code Specifies:

Full, fair, accurate and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its stockholders. Persons responsible for the preparation of such documents and reports and other public communications must exercise the highest standard of care in accordance with the following guidelines:

- all accounting records, and the reports produced from such records, must comply with all applicable laws;
- all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;
- all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;
- accounting records must not contain any false or intentionally misleading entries;
- no transactions should be intentionally misclassified as to accounts, departments or accounting periods;
- all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;
- no information should be concealed from the internal auditors or the independent auditors; and

- compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.

76. The Insider Trading Section of the Code specifies:

> Insider trading is unethical and illegal. Employees, officers and directors must not trade in securities of a company while in possession of material non-public information regarding that company. It is also illegal to "tip" or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties. The Company has an Insider Trading Policy, which sets forth obligations with respect of trading in the Company's securities.

77. The Code also requires that officers and directors comply with laws, rules and regulations:

> Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any stock exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety.
>
> Employees, officers or directors who fail to comply with this Code and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

78. Finally, regarding compliance with the Code, it specifies:

> Failure to comply with this Code or applicable laws, rules or regulations may result in disciplinary measures, including discharge from your position with the Company or removal from the Board of Directors. Violations of this Code may also constitute violations of law and may result in civil or criminal penalties for such person, such person's supervisors or the Company. The Board of Directors will determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of a violation of this Code in relation to officers and directors. In determining what action is appropriate in a particular case, the Board of Directors or its designee will consider the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation was intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past. The Determining Officer will determine appropriate actions to be taken in the event of a violation of this code in relation to all other employees.

> This Code cannot, and is not intended to, address all of the ethical complexities that may arise during the course of employment or association with the Company. There will be occasions where circumstances not covered by policy or procedure arise, and where a judgment must be made as to the appropriate course of action. In such circumstances, the Company encourages common sense decision-making, and consultation with a manager, member of human resources, or the Determining Officer for guidance pursuant to the methods discussed below in "Compliance and Contact Details".

## INSIDER TRADING POLICY

79. Humacyte also has a comprehensive Insider Trading Policy (the "Policy") that applies to "trading in Humacyte securities by members of Company's board of directors, officers and employees." The Policy includes the following:

> These policies and procedures are designed to help you comply with insider trading laws, handle confidential information properly and avoid potentially embarrassing public disclosures and the appearance of impropriety. You are receiving this policy because you are a Humacyte officer, director or employee, or an external contractor or consultant who has or may have access to material nonpublic information, and are subject to this policy.
>
> All directors, officers and employees, and external contractors and consultants who have access to material nonpublic information, are responsible for reading these policies and procedures and complying with them. Further, even after you are no longer employed by or affiliated with Humacyte, you must maintain the confidentiality of any confidential or proprietary information obtained during your employment or affiliation with Humacyte.
>
> Penalties for violating these policies and procedures may involve any appropriate remedy, including termination of employment. In addition, the Securities and Exchange Commission (SEC) and criminal prosecutors vigorously enforce insider trading laws. Violation of insider trading laws could result in civil and criminal penalties under applicable federal securities laws.

80. The Policy covers the following: "all transactions in all Humacyte securities, which may include common stock, preferred stock, debt securities, warrants or options to acquire common stock, derivative securities, units or any other type of securities that the Company may

issue. This policy also applies to securities of other companies about which you learn material nonpublic information during the course of your relationship with Humacyte."

81. The Company's Policy against insider trading is as follows:

**A. General Prohibition Against Insider Trading**

Federal and state laws prohibit "insider trading," the purchase or sale of securities, in breach of a fiduciary duty or other relationship of trust and confidence, on the basis of material nonpublic information about the security. Any covered person, or any other person designated by this policy, who has material nonpublic information relating to Humacyte may not, until the information becomes public or is no longer material:

- engage in transactions in Humacyte securities, directly or indirectly, except as specifically noted herein;
- recommend the purchase or sale of any Humacyte securities;
- engage in any other action to take personal advantage of that information, including but not limited to, passing on or "tipping" that information to someone who uses it for personal gain, regardless of the quantity of securities traded;
- disclose material nonpublic information to persons within Humacyte whose jobs do not require them to have that information, or outside of Humacyte to other persons, including, but not limited to family, friends, business associates, investors and expert consulting firms, unless any such disclosure is made in express accordance with Humacyte's policies regarding the protection or authorized external disclosure of information concerning the Company; or
- assist anyone engaged in the above activities.

Tipping arises when a covered person discloses material nonpublic information about Humacyte or another publicly-traded entity to another person or recommends another person to trade in the securities of a company while in possession of material nonpublic information about that company, and that person either (i) trades in a security of the company in respect of which you provided information or (ii) provides the information to a third person who then makes a trade in a related security. Tipping is illegal even if you do not personally make a trade or otherwise benefit from disclosing the information.

In addition, any covered person who learns of material nonpublic information about another entity, including an entity with whom Humacyte does

business, may not trade in that entity's securities until the information becomes public.

Although you may believe it is necessary or justifiable for independent reasons (such as the need to raise money for an emergency expenditure) to engage in a transaction involving Humacyte's securities, there are no exceptions to this policy's prohibition against insider trading. Even the appearance of impropriety must be avoided to preserve Humacyte's reputation for adhering to the highest standards of conduct.

To ensure compliance with this policy, all covered persons must protect the confidentiality of material nonpublic information, by, for example, avoiding casual conversations about such information in public areas and storing files containing material nonpublic information in secure locations. This policy also covers communications and postings made through the Internet. You must not post any nonpublic or confidential information on the Internet, including through chatrooms, discussion groups, or social media platforms. This includes anonymous posts or discussion on the Internet. For more information, please see the Company's social media policy.

Because insider trading law is complex, you should contact the CFO if you have any questions about whether information in your possession is material or nonpublic or if a proposed transaction or communication would violate the insider trading laws. You must also report any unauthorized disclosure of material nonpublic information, whether inadvertent or otherwise, immediately to the CFO.

**B. What Information is "Material"?**

For the purposes of these policies and procedures, information is "material" if a reasonable investor would consider that information important in making a decision to trade securities. It is also information that, if disclosed, is reasonably likely to affect the market price of Humacyte's securities. Both positive and negative information can be material. Further, courts and the SEC have declined to identify all information that could be deemed to be material. Some examples of material information include:

- quarterly or annual earnings information and guidance, including estimates or revisions;

- discussions, proposals or agreements for a significant merger, acquisition or divestiture;

- threatened litigation or administrative actions, or material developments in such matters;

- significant new or prospective contracts, licensing or collaboration agreements;
- significant developments or announcements involving the U.S. Food and Drug Administration and any Humacyte products, regulatory applications, or clinical trials;
- significant changes in marketing, pricing strategies or market share;
- significant research and development initiatives, clinical studies, clinical data or new product prospects;
- changes in business strategies;
- changes in key members of management;
- a significant cybersecurity breach or incident;
- changes in debt ratings; and
- stock splits or changes in dividend policies. The foregoing list does not include all of the information that could be deemed to be material.

**C. What Information is "Nonpublic"?**

Information is "nonpublic" if it has not been widely disseminated to the public, such as through a press release carried over a major news service, a public filing with the SEC or materials sent to stockholders (e.g., a proxy statement or widely disseminated prospectus). Information is also nonpublic if it has been widely disseminated to the public, but sufficient time has not elapsed to permit the investment community to absorb and evaluate the information. In general, one full business day after public release is deemed sufficient for investor absorption and evaluation.

The distribution of information through narrower channels may be insufficient to make it public. For example, merely posting information on a website may not satisfy the "widely disseminated" standard to make such information public. Also, the fact that nonpublic information is reflected in rumors in the marketplace does not mean that the information has been publicly disseminated. It is important to note that even after information becomes public, many aspects relating to a matter may remain nonpublic.

82. The Policy establishes the following specific rules:

**A. Participation in Expert Networks or Similar Consulting Arrangements**

You are not permitted to provide information or services about or relating to Humacyte to "expert network firms" or similar consulting firms. Expert network firms may seek to engage you as a consultant due to your knowledge of Humacyte, or your knowledge of our industry overall. Your provision of such consulting services creates the risk that you may use or disclose, deliberately or inadvertently, Humacyte's confidential information or engage, or assist another party in engaging, in activities that are detrimental to or competitive with the Company. Such activity may also violate federal securities laws. Accordingly, participation in such organizations is strictly prohibited.

**B. Derivatives Transactions**

You may not engage in derivative transactions involving Humacyte's securities. Derivative transactions are speculative transactions that permit a person to leverage his or her investment using a relatively small amount of money. Transactions in options (other than stock options issued by Humacyte) may create the appearance that a covered person is trading based on material nonpublic information and may focus a covered person's attention on Humacyte's short-term performance. Examples of derivative transactions include, but are not limited to, purchases and sales of put and call options.

**C. Hedging, Pledging, and Lending**

You are prohibited from hedging and lending Humacyte securities in any transaction, including by entering into any short sales, swaps, options, puts, calls, forward contracts or any other similar derivatives transaction. Unless authorized in advance by the Board of Directors of Humacyte, you are prohibited from pledging Humacyte securities in any transaction.

**D. Short Sales**

You may not engage in short selling of Humacyte securities. Selling short includes transactions in which you borrow securities from a broker, sell them, and eventually buy securities on the market to cover the number of securities borrowed from the broker. Profit is made if the price of the securities decreases during the period of borrowing. Short sales may evidence an expectation on the part of the seller that the securities will decline in value, and therefore have the potential to signal to the market that the seller lacks confidence in the Company's prospects.

**E. Margin Accounts**

You may not engage in purchasing Humacyte securities on margin. Purchasing Humacyte securities on margin involves the use of borrowed money from a brokerage firm to purchase the securities. Holding Humacyte securities in a margin account means that the securities can be sold to pay a loan to the brokerage firm. Covered persons are prohibited from holding Humacyte securities in a margin

account because a margin sale might occur at a time when the covered person is aware of material nonpublic information.

**F. Post-Termination Transactions**

You may not engage in trading in Humacyte securities while in the possession of material nonpublic information after your relationship with the Company has ended. This policy continues to apply to transactions in Humacyte securities even after termination of service to Humacyte. If an individual is in possession of material non-public information when his or her service terminates, that individual may not trade in Humacyte securities until that information has become public or is no longer material.

83. Regarding with trading is "generally" permitted, the Policy specifies:

To help directors, officers and employees conduct trades in Humacyte securities in compliance with the general prohibition described above, Humacyte has established mechanisms for effecting trades in the company's securities in compliance with these policies and procedures. If you are not certain whether a proposed transaction complies with the mechanisms described below, you should contact the CFO.

**A. Window Periods**

The Company requires that covered persons limit their trading in Company securities to prescribed "Window Periods." The periods between Window Periods are considered "Blackout Periods". Covered persons may not engage in trades in Company securities during Blackout Periods. The requirement to make trades during a Window Period does not apply to transactions described below under the headings "Rule 10b5-1 Plan Trading," "Option Exercises," "Estate Planning and Gifts," "Employee Stock Purchase Plans" and "Tax Obligations."

Under this policy, a Window Period begins at market opening on the second business day after the Company has issued its usual press release announcing quarterly results and ends two weeks prior to the end of the applicable fiscal quarter. The Company retains the discretion to close a Window Period in the event of any major corporate development that has not been announced to the public. The closing or opening of any Window Period will be announced by email and by posting on Humacyte's intranet. If you think you have any material nonpublic information during the Window Period, however, you must consult the CFO before trading Humacyte securities.

Humacyte also strongly encourages employees, family members and close associates of any officer, employee or member of the board of directors to confine their trading in Humacyte securities to a Window Period. While there is no violation of insider trading rules if it can be shown that a family member or other person

associated with a director, officer or employee acted independently when trading and without knowledge of material nonpublic information, a strong presumption may arise that material nonpublic information has been shared with such person by the officer, employee or member of the board of directors.

**B. Special Blackout Periods**

The Company may impose special periods during which certain covered persons will be prohibited from trading or otherwise effecting transactions in Humacyte securities ("special blackout periods") even though the Window Period would otherwise be open. This would be the case, for example, for Company employees working on a material merger or acquisition transaction, or another event that could involve material nonpublic information. If a special blackout period is imposed, the Company will notify affected individuals by sending them a notice. The Company will also notify affected individuals at the end of such special blackout period.

Please note that special blackout periods may apply to all individuals working on material transactions or other matters that could involve material nonpublic information, even if those individuals only have a limited role in the transaction. A special blackout period for these matters is not necessarily limited to individuals who are on any particular team or function. The determination of whether a project or transaction is material will be made by the CFO in consultation with the Disclosure Committee.

**C. Rule 10b5-1 Plan Trading**

To avoid liability for insider trading, officers and members of the board of directors may wish to rely upon the affirmative defenses established by Rule 10b5-1 under the Securities Exchange Act of 1934 (the "Exchange Act"). Rule 10b5-1 is available to an individual or entity who purchases or sells a security under a binding contract, specific instruction or written plan that the person or entity put into place before becoming aware of material nonpublic information (such a written plan, a "Rule 10b5-1 plan"). If the trading plan meets all of the requirements of Rule 10b5-1, Humacyte securities may be purchased and sold under such plan without regard to certain insider trading considerations, and such trades would not be restricted to the window periods under this policy.

The Company strongly encourages any of the following covered persons who wish to trade in Humacyte securities to limit such trading activity to Rule 10b5-1 plans adopted in accordance with this policy: (i) members of the board of directors, (ii) officers appointed by the board of directors and (iii) members of the Humacyte leadership team (HLT). In addition, other covered persons who wish to trade in Humacyte securities may be encouraged to limit their trading activity to Rule 10b5-1 plans adopted in accordance with this policy, based on the determination of the CFO.

A covered person who enters into a Rule 10b5-1 plan is strongly discouraged from trading in any securities of the Company outside of the Rule 10b5-1 plan.

To create a Rule 10b5-1 plan, you must enter into a written plan for trading securities that must:

- specify the amount, price and date of the transaction(s);
- include a written formula, algorithm or computer program for determining the amount, price and date of the transaction(s); or
- not permit the person for whom shares are being purchased or sold to exercise any subsequent influence over how, when or whether to effect purchases or sales, while at the same time ensuring that the person effecting the trades is not aware of any material nonpublic information at the time of the trades.

In order to rely on the defense, a person must adopt a Rule 10b5-1 plan that meets all of the rule's requirements. These include a requirement that the plan include a representation certifying that the person adopting the plan is doing so in good faith, at a time when he or she is not in possession of material nonpublic information and not as part of a plan to evade the insider trading prohibitions. Additionally, a director or officer adopting a new Rule 10b5-1 plan may not have any other outstanding Rule 10b5-1 plan, and may not subsequently enter into any additional Rule 10b5-1 plan, subject to certain exceptions. Frequent amendment of, or deviation from, a trading plan may make it difficult for an insider to demonstrate that he or she has satisfied the rule's "good faith" requirement.

A Rule 10b5-1 plan must provide for a "cooling off" period before purchases and sales can occur under the plan. For a director or officer, no purchases or sales under the Rule 10b5-1 plan can occur until the later of (i) 90 days after the adoption of the Rule 10b5-1 plan and (ii) two business days following disclosure of the Company's results in a Form 10-Q or Form 10-K for a completed fiscal quarter in which the plan was adopted; provided, however, that in no event will the required cooling off period be longer than 120 days after adoption of the Rule 10b5-1 plan. No purchases or sales under a Rule 10b5-1 plan for a person other than a director or officer may be made until 30 days after adoption of the plan.

Any modification to the amount, pricing, or timing of purchases or sales of securities under a Rule 10b5-1 plan will constitute the termination of the plan and adoption of a new plan, which means that any such modification will trigger the need for the new trading plan to satisfy all of the elements of Rule 10b5-1, including a new cooling off period before trading can begin again.

Stock brokerage firms may assist directors, officers and employees in establishing Rule 10b5-1 plans. To ensure that such arrangements comply with Rule 10b5-1, Humacyte requires that any covered person who wishes to establish a Rule 10b5-1 plan:

- enter into the required contract, provide the required instructions, or adopt the required plan, during a Window Period and otherwise while not in possession of material nonpublic information;
- obtain prior approval from the CFO for such Rule 10b5-1 plan, as well as any amendment of such plan;
- report promptly to the CFO all transactions made pursuant to the Rule 10b5-1 plan, as well as any termination of the plan; and • adopt a plan with a duration of at least 6 months.

**D. Options Exercises**

Directors, officers and employees who have stock options or other rights granted by Humacyte to purchase securities from the Company may exercise the options or purchase rights at any time permitted under the terms of the applicable option or other agreement so long as the exercise does not involve a broker-assisted cashless exercise. This rule applies only to options or purchase rights granted by the Company. Rules pertaining to options or purchase rights granted by third parties are described in the sections above captioned "Derivatives Transactions," "Short Sales" and "Margin Accounts." Please be aware, however, that any subsequent sale of securities purchased by means of the exercise of stock options or other rights in accordance with this policy must be made during a Window Period, pursuant to a Rule 10b5- 1 plan, or otherwise approved by the CFO.

**E. Estate Planning**

Directors, officers and employees may at any time make bona fide gifts of Humacyte securities (such as charitable donations or family gifts or estate planning transfers). Depending on the circumstances, recipients of gifts may be subject to restrictions on subsequent sales of securities. Any such gifts made by directors and officers subject to Section 16 of the Exchange Act must be reported on Form 4 within two business days of the date of the transaction.

Gifts that are part of a plan to circumvent the insider trading rules are not permitted.

**F. Employee Stock Purchase Plans**

Purchases of Humacyte stock under the Company's employee stock purchase plan, if any, resulting from periodic or lump sum contributions of money thereto, pursuant to an election made at the time of plan enrollment, are not subject

to this policy. Your initial election to participate in the plan, changes to that election for any enrollment period and sales of Humacyte stock purchased pursuant to the plan are subject to this policy and must comply therewith.

**G. Tax Obligations**

Transactions between covered persons and Humacyte that are undertaken to satisfy tax obligations, such as upon the vesting of restricted stock units and the net issuance of shares, which effectively involves disposing of vested shares to the Company, are exempt under this policy.

84. The Policy also establishes pre-clearance procedures:

The following Company personnel may not trade or engage in any other transaction involving the Company's securities (including a securities plan transaction such as an option exercise, a gift, a loan or pledge, a contribution to a trust or any other transfer) without first obtaining pre-clearance of the transaction from the CFO:

- all directors, executive officers and members of HLT who trade outside of a Rule 10b5- 1 plan entered into in accordance with this policy;
- key financial or investor relations employees as designated by the CFO; and
- all such other individuals as designated by the CFO.

This pre-clearance requirement applies regardless of whether (i) the individual subject to preclearance possesses material nonpublic information regarding the Company or its securities or (ii) the trade occurs during a Window Period.

A request for pre-clearance must be submitted to the CFO, or the Chief Executive Officer in the case of requests for pre-clearance made by the CFO, at least two business days prior to consummation of an intended transaction. Notice may be given orally or in writing and should include in the request (i) the transaction type, (ii) the number and type of securities he or she intends to trade, (iii) the intended transaction date, (iv) a confirmation that he or she has reviewed this policy and (v) a confirmation that he or she is not aware of any material nonpublic information about the Company or its securities. Approval or denial of the preclearance request will be provided to the insider in writing.

If a proposed transaction receives pre-clearance, the pre-cleared trade must be effected by the close of business on the second business day following receipt of pre-clearance unless (i) the insider becomes aware of material nonpublic

> information or (ii) the insider is advised by the Company that the pre-clearance has been revoked prior to that time. In the case of either (i) or (ii), the trade must not be completed. For example, if the pre-clearance were issued on a Friday, it would generally be effective through the close of business on the next Tuesday. If the transaction order is not placed within this time period, clearance of the transaction must be re-requested. Notice of a pre-cleared transaction must be provided by the applicable insider to the CFO on the same date of execution. Please note that the date of execution is the trade date and not the settlement date.

85. On top of these rules and regulations as detailed above, the Policy also has an Annex ("Annex A") that specifies "Additional Policies and Procedures on Trading Humacyte Securities by Company Directors and Officer," or all of the Individual Defendants. Annex A specifies:

> **A. Section 16(a) Reporting Requirements**
>
> Section 16(a) of the Exchange Act requires that Humacyte's insiders file electronic beneficial ownership reports in connection with their purchases and sales of the Company's securities. Securities and Exchange Commission ("SEC") rules require that all filings be made with the SEC electronically and on Humacyte's website. Further, Humacyte is required to disclose in its annual proxy statement the names of all insiders who have failed to timely file all required Section 16(a) reports.
>
> **1. Form 3**
>
> An insider must file a Form 3 (entitled "Initial Statement of Beneficial Ownership of Securities") with the SEC to report that he or she is an insider and his or her ownership interests in Humacyte. Anyone becoming an insider in the future must file a Form 3 within ten days of becoming an insider.
>
> **2. Forms 4 and 5**
>
> An insider must file a Form 4 (entitled "Statement of Changes in Beneficial Ownership") with the SEC to report a transaction within two business days after the date of such transaction if it results in a change in his or her beneficial ownership of Humacyte's equity securities. There are three general exceptions to the two-business-day reporting requirement.
>
> First, the following types of transactions may be reported on a Form 4 within two business days following the date the insider receives notice of the transaction (but in no event later than five business days following the transaction), rather than two business days following the date on which the transaction occurs:

- a transaction pursuant to a Rule 10b5-1 plan under which the insider does not select the date on which the purchases or sales take place; and

- a "discretionary transaction" (as defined in Rule 16b-3) pursuant to an employee benefit plan for which the insider does not select the date on which transactions take place (such as transfers in or out of, or cash withdrawals from, a company stock fund in a 401(k) plan or other employee benefit plan).

Second, certain transactions may, and in a few instances must, be reported on a yearend Form 5 (entitled "Annual Statement of Changes in Beneficial Ownership of Securities"). A Form 5 must be filed with the SEC within 45 days after the end of such fiscal year by each person who was an insider for any part of a company's fiscal year (unless he or she has no transactions to report on the Form 5). There are certain limited types of stock transactions that the SEC has designated as eligible for Form 5 filing (rather than a Form 4 filing). Insiders also must report on a Form 5 all transactions that occurred during the fiscal year that should have been, but were not, reported earlier on Form 4.

Third, the following types of transactions do not trigger any Form 4 or Form 5 filing requirement:

- an acquisition under an employee stock purchase plan;

- a transaction (other than a "discretionary transaction") under certain employee benefit plans, such as pension plans, 401(k) plans, or related excess benefit plans;

- an acquisition through a stock split, stock dividend or other pro rata distribution to stockholders of the Company;

- an acquisition under certain dividend or interest reinvestment plans; and

- an acquisition or disposition as a result of a domestic relations orders (such as a divorce decree).

Although these transactions do not require the filing of a Form 4 or Form 5, the next Form 4 or Form 5 filed after the occurrence of one of these transactions should reflect the effects of these transactions in the column reporting post-transaction security ownership.

**3. Preparation of Forms 3,4 and 5**

Although the responsibility for the timely filing of reports and compliance with trading restrictions rests with each individual required to report or comply, the CFO will prepare and file Forms 3, 4, and 5 on behalf of insiders who are Company

> directors and officers. All Forms 3, 4, and 5 prepared on behalf of an insider will be based on information provided by the insider. Accordingly, all insiders must fill out and deliver to the CFO a Form ID (a form to obtain access codes to file on the SEC's electronic filing system).
>
> **B. Section 16(b) Short-Swing Profit Liability**
>
> Section 16(b) of the Exchange Act allows the Company to recover any profit realized by one of its insiders resulting from any combination of purchases and sales of Humacyte's equity securities within a period of less than six months. Such liability arises without regard to whether any such transactions occur during the Window Period referred to above. Profits are determined for this purpose by matching the highest sales price during the period with the lowest purchase price and are to be recovered even though the insider realized no actual profit for the period or he or she sustained a net loss. Although the purpose of the statute is to prevent trading on the basis of material nonpublic information, the recovery provision operates without regard to the intent of the insider or the actual possession of material nonpublic information and may not be waived by the Company.
>
> The restrictions on "short-swing" trading apply not only to trading in Humacyte's securities but also to any "derivative security." Thus, for example, a grant or exercise of options (other than grants or exercises made under a plan that is exempt from Section 16) would be considered to be a "purchase" or sales of Humacyte securities under Section 16. Other transactions not necessarily thought to involve purchases, such as corporate mergers, also may be covered. The SEC has exempted certain transactions, such as purchases under employee benefit plans that have been approved by stockholders or the board of directors, from the "short-swing" profit recovery provisions of Section 16 (but not the reporting provisions). Directors and officers remain subject to these Section 16 requirements and restrictions for a period of up to six months after terminating their positions with Humacyte.

**AUDIT COMMITTEE CHARTER**

86. In addition to the duties above, under the Company's Audit Committee Charter, as members of the Audit Committee during the Relevant Period, Defendants Constantino (Chair), Sebelius, and Windham-Bannister (collectively the "Audit Committee Defendants") owed specific additional duties to Humacyte. Pursuant to the Charter, the purpose of the Audit Committee is to:

> assist the Board in fulfilling its oversight responsibilities relating to the Company's financial accounting, reporting and controls and certain key corporate governance

functions of the Board. The Committee's principal functions are to (i) oversee the quality and integrity of the Company's financial statements and accounting and financial reporting processes, systems of internal control and the audits of the Company's financial statements by the Company's independent auditors (the "**Independent Auditors**"), (ii) oversee the Independent Auditors' qualifications and independence and the performance of the Company's internal audit function and the Independent Auditors, (iii) provide risk management and governance oversight, and (iv) ensure the Company's compliance with legal and regulatory requirements.

The chairperson of the Committee (the "**Chair**") will facilitate communication among the Independent Auditors, the Company's financial and senior management and the Board.

87. The responsibilities and duties of the Audit Committee include the following:

**A. Financial Statements and Disclosures.** The Committee is responsible for oversight of the independent audit of the Company's financial statements. The Committee will:

1. Review the Company's annual and quarterly financial statements prior to their public release, including any report on the Company's internal control over financial reporting and any report or opinion by the Independent Auditors, and consider whether such statements, reports and opinions are complete, consistent with information known to the Committee and reflective of appropriate accounting principles.

2. Review other sections of any annual or quarterly report or similar filing and any related regulatory filings, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to consider the accuracy and completeness of the information contained therein prior to their public release.

3. If appropriate, recommend the annual audited financial statements to the Board for inclusion in the Company's Annual Report on Form 10-K.

4. In connection with the Committee's review of the annual and quarterly financial statements:

   - discuss the financial statements and the results of the Independent Auditors' audit or review, as applicable, of the financial statements with the Independent Auditors, the internal audit function and the Company's management;

- discuss any items communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"). These discussions should include the Independent Auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements, any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information, and any other matters related to the conduct of the audit, including any "critical audit matters";

- discuss with the Company's management and the Independent Auditors the Company's selection, application and disclosure of critical accounting policies and practices; and

- review and discuss with the Company's management earnings press releases and the use of any "pro forma" financial information or non-GAAP financial measures, prior to public disclosure.

5. Review the following on at least an annual basis:

- any major issues, as determined by the Committee, regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material weaknesses or significant deficiencies;

- analyses prepared by management or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles methods on the financial statements; and

- the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

6. 6. Provide a report for inclusion in the Company's annual proxy statement in accordance with the rules and regulations of the SEC.

**B. Internal Controls.** With respect to the Company's internal controls, the Committee will:

1. Oversee the integrity of accounting and financial reporting processes of the Company and its systems of internal control over financial reporting, including any significant deficiencies and material weaknesses in their design or operation.

2. 2. Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.

3. Review with management and the Independent Auditors the adequacy and effectiveness of the Company's internal controls.

4. Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the completeness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.

**C. Internal Audit.** With respect to the Company's internal audit activity, the Committee will:

1. Review with management the charter, activities, budget, staffing, organizational structure and effectiveness of the internal audit function.

2. Have final authority to review and approve the annual internal audit plan and all major changes to the plan.

3. Inquire of management whether any internal audit engagements or non-audit engagements were completed but not reported to the Committee, and if so, whether any matters of significance arose from such work.

4. Receive and discuss quarterly updates regarding the Company's risk management processes and systems of internal control.

**D. Independent Auditors.** With respect to the Company's independent auditors, the Committee will:

1. Review and approve the selection, compensation, and retention of

the Independent Auditors, which shall report directly to the Committee.

2. Review the continuing independence of the Independent Auditors, including:

- obtaining and reviewing, on an annual basis, a letter from the Independent Auditors describing all relationships between the Independent Auditors and the Company;

- at least annually, including in connection with the receipt of such letter, reviewing and discussing with the Independent Auditors their independence, including the nature and scope of any such relationships; and

- taking, or recommending that the Board take, appropriate action to oversee the independence of the Independent Auditors, including discontinuing any relationships that the Committee believes could compromise the independence of the Independent Auditors.

3. Obtain and review, at least annually, a report from the Independent Auditors describing the firm's internal quality-control procedures and any material issues raised by the most recent internal quality-control review, peer review or investigation by governmental or professional authorities, within the preceding five years, including the PCAOB, and any steps taken to address any such issues.

4. Review and approve the proposal for audit planning, scope and staffing developed by the Independent Auditors, consistent with the Company's Independent Auditor Pre-Approval Policy (the "Pre-Approval Policy").

5. Set hiring policies for the Company's hiring of employees or former employees of the Independent Auditors, as required by regulations and by applicable stock exchange listing standards.

6. Review and approve, at least on an annual basis, and consistent with the Pre-Approval Policy, all audit and non-audit services (including the fees and terms thereof) to be provided by the Independent Auditors.

7. Periodically review and evaluate the performance of the lead audit partner of the Independent Auditors, oversee the rotation of the lead audit partner responsible for the Company's audit and review and consider the selection of the lead audit partner.

8. Periodically consider whether there should be a rotation of the Independent Auditors.

9. Review and discuss with the Independent Auditor any audit problems and the Company management's response, including any restrictions on the scope of the Independent Auditor's activities or on access to requested information, and any significant disagreements with management (including resolution of any such disagreements).

10. Review and discuss with the Independent Auditors the reports delivered to the Committee by the Independent Auditors regarding:

- critical accounting policies, critical audit matters, estimates and practices used;

- alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the alternatives and the treatment preferred by the Independent Auditors; and

- other material written communications between the Independent Auditors and the Company's management, such as any management letter or schedule of unadjusted differences.

**E. Compliance; Values and Ethics.** With respect to the Company's compliance process and its values and ethics practices, the Committee will:

1. Oversee the Company's (i) compliance with applicable laws and regulations, (ii) compliance framework and (iii) compliance program.

2. Oversee the investigation and follow-up (including disciplinary action) of any instances of material or significant noncompliance, including reports that involve actual or alleged violations of the Company's Code of Conduct and Ethics.

3. Review ongoing investigations, findings of any examinations by regulatory authorities, and the Company's responses to such investigations, findings and examinations.

4. Review and discuss quarterly updates from the Company's management and legal counsel regarding compliance matters.

5. Investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

6. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

7. Oversee the Company's systems and controls for ethical behavior and the prevention of bribery and receive and respond to reports on non-compliance.

**F. Risk Management; Fraud.** With respect to the Company's risk management and its processes for preventing and detecting fraud, the Committee will:

1. Annually review the Company's risk profile, including without limitation with respect to cybersecurity matters.

2. Obtain an annual report on management's implementation and maintenance of an appropriate Company-wide risk management process, as appropriate.

3. Review the risk management processes established and maintained by management and the procedures in place to ensure that they are operating as intended.

4. Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to risk assessment and risk management.

5. Receive and discuss quarterly updates from management regarding the Company's risk management processes and systems of internal control.

6. Oversee management's arrangements for the prevention, deterrence and detection of fraud and for management's responses to allegations of fraud.

7. Review any allegations of fraud disclosed to the Committee involving management or any employee of the Company with a significant role in the Company's internal controls over financial

reporting, legal compliance or corporate governance.

8. Challenge management and auditors, both internal and the Independent Auditors, to ensure that the Company has in place appropriate antifraud programs and controls and to ensure that investigations are undertaken if fraud is detected.

**G. General.** With respect to the authority, responsibilities and performance of the Committee pursuant to this Charter, the Committee will:

1. Periodically review the status of any legal matters or regulatory changes that could have a significant impact on the Company's financial statements.

2. Review and, where appropriate, approve or waive conflicts of interest or related party transactions consistent with the corporate policies on conflicts of interest and related party transactions.

3. Carry out any other responsibilities and duties delegated to it by the Board or as the Committee deems necessary or appropriate consistent with its purpose.

88. Regarding studies and advisors, the Charter specifies:

The Committee, in discharging its responsibilities and duties, may conduct, direct, supervise or authorize studies of, or investigations into, any matter that the Committee deems appropriate, with full and unrestricted access to all books, records, documents, facilities and personnel of the Company. The Committee has the sole authority and right, at the expense of the Company, to retain and terminate legal counsel, other consultants, accountants, experts and advisors of its choice to assist the Committee in connection with its functions. The Committee will have the sole authority to approve the fees and other retention terms of any such third parties. The Company will provide for appropriate funding, as determined by the Committee, for:

- payment of compensation to the Independent Auditor and any legal counsel and other consultants, accountants, experts and advisors retained by the Committee; and

- ordinary administrative expenses of the Committee that are necessary and appropriate in carrying out its functions.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

89. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

90. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

91. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

92. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, the Individual Defendants, as directors of Humacyte, were direct, essential, and significant participants, collectively and individually, in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

93. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of his or her overall role in furthering the misconduct.

94. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Humacyte, and at all times operated within the course and scope of that agency.

## FACTUAL BACKGROUND

95. Humacyte was formed through a SPAC transaction involving Legacy Humacyte and AHAC. Pursuant to a merger agreement among Legacy Humacyte, AHAC, and Hunter Merger Sub ("Hunter"), a wholly owned subsidiary of AHAC, the merger was completed on August 26, 2021. In connection with the transaction, Hunter merged into Legacy Humacyte, with Legacy Humacyte surviving the merger as a wholly owned subsidiary of AHAC. AHAC subsequently changed its name to Humacyte, Inc., while Legacy Humacyte was renamed Humacyte Global, Inc.

96. Humacyte maintains its corporate headquarters, manufacturing operations, and research and development facilities at its Durham Facility.

97. Humacyte describes itself as a pioneer in the development and manufacture of off-the-shelf, universally implantable, bioengineered human tissues, advanced tissue constructs, and organ systems. The Company states that its objective is to improve patient outcomes and transform the practice of medicine.

98. The Company represents that its regenerative medicine technology could overcome limitations associated with existing standards of care and address the lack of meaningful innovation in products designed to facilitate tissue repair, reconstruction, and replacement. Humacyte claims to employ its novel and scalable technology platform to develop proprietary, bioengineered, acellular human tissues intended to treat diseases and conditions affecting various anatomical sites across multiple therapeutic areas.

99. Humacyte's principal focus is the engineering and manufacture of HAVs designed to be readily implanted in patients without provoking a foreign-body response or immune rejection.

100. Humacyte manufactures its 6-millimeter HAVs used in clinical trials at the Durham Facility. There, the Company has purportedly developed a scalable, modular manufacturing process known as the LUNA200 system. According to Humacyte, the LUNA200 system is intended to permit the manufacture of HAVs at commercial scale in accordance with Current Good Manufacturing Practice ("cGMP") requirements.

101. On May 12, 2023, Humacyte entered into the Oberland Funding Agreement to fund the continued development and commercialization of HAVs, among other purposes. Pursuant to the agreement, Humacyte received an initial upfront payment of $40 million (the "First Payment").

102. The Company was also eligible to receive additional contingent installments totaling up to $110 million. Each installment was subject to specified conditions relating to FDA acceptance (the "Second Payment"), FDA approval (the "Third Payment"), or the achievement of specified sales milestones (the "Fourth Payment"). Receipt of each successive installment was further conditioned upon payment of the preceding installment.

103. In particular, the Second Payment entitled Humacyte to $20 million if the FDA accepted the Company's proposed BLA for HAVs intended for urgent arterial repair following vascular trauma on or before March 31, 2024. The Third Payment provided for an additional $40 million upon FDA approval, on or before December 31, 2024, of the BLA for the use of HAVs in vascular trauma, provided that the First and Second Payments had been made. The Fourth

Payment provided for an additional $50 million upon the achievement of specified sales milestones, subject to the prior receipt of all other payments.

104. On December 12, 2023, Humacyte submitted its BLA to the FDA seeking approval of HAVs for the treatment of vascular trauma.

105. Although Humacyte expected to manufacture HAVs at its Durham Facility, the Company was experiencing deficiencies in its internal controls and failed to disclose to investors that the facility was not complying with certain quality assurance requirements. These deficiencies resulted in a delay in the FDA's regulatory review of Humacyte's BLA for HAV.

***The FDA Issues a Form 483 Letter to Humacyte on April 5, 2024***

106. From April 1, 2024 through April 5, 2024, the FDA inspected the Durham Facility trial site. On April 5, 2024, the final day of the inspection, the FDA issued Humacyte a Form 483 Letter identifying multiple violations at the Durham Facility.

107. Among other things, the Form 483 Letter stated:

> 1. There is no microbial quality assurance of the [redacted] used for the [redacted]. Specifically, there is no microbial testing or [redacted] formulated using [redacted] steps.
>
> 2. Quality oversight is inadequate for the following issues observed:
>
>    a. Investigating Out of Specification Results, SOP-0313-04, does not contain procedures for requesting an extension or opening a deviation if the investigation is not completed within the recommended 60 days. There were 10 out of 31 out-of-specifications from [redacted] that were open for more than 100 days, with the longest being open for 710 days.
>
>    b. The contract cleaning crew was not current with their [redacted] cGMP Refresher Training as required by the Training Program SOP-0315-04. Additionally, one member of the cleaning crew was not current on the GxP Cleaning Contractor Core Training "Facility Cleaning and Disinfection."

c. A complete record for the role-based training [redacted] was not available for and operator observed participating in [redacted] in [redacted] Room [redacted].

d. The quality review of the [redacted] preventive maintenance of the air handling unit was approved without the required documentation in [redacted] per Use of [redacted] SOP-0127-01 and Preventative Maintenance, SOP-0169-04.

## FASLE AND MISLEADING STATEMENTS

108. Through a series of public statements and disclosures, the Individual Defendants breached their fiduciary duties by making, or causing the Company to make, materially false and misleading statements and by withholding material adverse information concerning Humacyte's business, operations, and prospects. Among other things, the Individual Defendants failed to disclose that: (i) the HAV presented significant health and safety concerns, including risks of rupture and deficiencies in the underlying studies; (ii) the Company lacked adequate capital to sustain its operations without additional cash obtained through public offerings and contingent financing; and (iii) the Individual Defendants failed to properly discharge their oversight responsibilities with respect to mission-critical health and safety matters, including quality assurance and microbial testing at the Durham Facility.

***Second Quarter 2023 Financial Results***

109. On August 14, 2023, Humacyte issued a press release reporting its financial results for the second quarter ended June 30, 2023 (the "August 14, 2023 Press Release"). Under the heading "Second Quarter 2023 and Recent Corporate Highlights," the August 14, 2023 Press Release stated: "Clinicians reported that the rate of success in treating patients with the HAY was high, with an observed 30-day HAY patency (presence of blood flow) of 95%, 30-day limb salvage of 100%, 30-day survival of 100%, and zero cases of infection of the HAY."

110. With respect to Humacyte's liquidity, the August 14, 2023 Press Release stated:

> The Company reported cash and cash equivalents of $114.6 million as of June 30, 2023. In May 2023, Humacyte reported the completion of an up to$160 million funding arrangement with Oberland Capital Management, of which it has received $40 million. Humacyte believes that its cash and cash equivalents and expected funding from the Oberland funding agreement are adequate to fund operations past the anticipated timelines for potential FDA approval and commercialization of the HAY in the vascular trauma indication.

111. During the accompanying earnings call (the "August 14, 2023 Earnings Call"), Defendant Niklason made the following representations concerning the HAV's safety, efficacy, and purportedly successful trial results:

> Ukrainian surgeons treating war-wounded patients with the HAY are reporting a very high success rate. At 30 days after implantation, the limb salvage in patients treated with the HAY is 100%. This is a remarkable result, especially in light of the fact that an estimated 20,000 to 50,000 war-wounded patients have lost limbs in Ukraine since the start of the conflict only 18 months ago.
>
> In addition, available data from our humanitarian aid experience indicate that the 30-day patency, or blood flow in the HAY was present in 95% of patients. Importantly, in the treatment of these wartime traumatic injuries, there were no instances of infection of the HAY.

112. When an analyst inquired how the V017 Ukraine trial compared with Humacyte's earlier studies, Defendant Niklason responded:

> [T]he patency results in Ukraine have been outstanding. They're actually not that different from some of the early patency results that we've talked about for Y005 in some calls that we've done earlier. I would say that this is a 30-day patency rate, and it's also in relatively young[,] healthy patients. The warriors in Ukraine don't have a lot of peripheral vascular disease. So, this really allows the HAY to shine in the sense that it's being implanted into relatively healthy people with severe injuries, but relatively healthy people. And so, the 100% patency at 30 days really reflects the inherent properties of the HAY.

113. In response to another analyst question concerning the benchmark used for the Company's V005 Phase 2/3 clinical trial, Niklason responded:

> [T]he historical control benchmark for the V005 trial is based on a comprehensive literature review. And the structure of the literature review and the meta-analysis was actually something that we agreed upon with the FDA before undertaking this. So, this is really a comprehensive review of the world's literature over the last 20

> years using any type of synthetic graft. So, this means anything made out of a plastic. So, this is excluding things like CryoVein or xenografts, for example, but any synthetic graft of any type used in vascular trauma over the last 20 years. But this is also high-quality studies.... [T]he surgical literature is sometimes messy, and there's a lot of single-arm studies that are of low quality. Those studies were excluded with agreement from the FDA. So, we're focusing on high-quality studies. And because of that, the benchmark that we've obtained, we feel is robust and we feel will provide excellent support for eventual approval of the HAV and trauma.

114. During the August 14, 2023 Earnings Call, Defendant Sander likewise represented that Humacyte had adequate liquidity, stating:

> As of June 30, 2023, we had cash and cash equivalents of $114.6 million. In May 2023, we reported the completion of a funding arrangement with Oberland Capital of up to $160 million, of which we have received $40 million. We believe our cash and cash equivalents and planned funding from the Oberland funding agreement are adequate to fund operations past the anticipated timelines for approval and commercialization of the HAV in vascular trauma.

115. In response to a question concerning Humacyte's cash burn rate, Sander further stated that he:

> would not expect more than a $40 million bum for the remainder of [2023]… [W]e've given a sense that the Oberland transaction, combined with how we expect to operate, and also the cash on hand we expect takes us well past the approval and commercialization in vascular trauma. But from a calendar point of view, that means going to the end of 2025 at a minimum in terms of how we expect to operate.

116. Also on August 14, 2023, Humacyte filed its quarterly report on Form 10-Q with the SEC (the "Q2 2023 Form 10-Q"). Defendants Niklason and Sander signed the Q2 2023 Form 10-Q. The filing also contained certifications under the Sarbanes-Oxley Act of 2002 ("SOX"), executed by Niklason and Sander, attesting to the absence of fraud and the accuracy and material completeness of the filing.

117. The Q2 2023 Form 10-Q repeatedly represented that Humacyte possessed sufficient liquidity to finance its operations. For example, it stated:

> As of June 30, 2023, we had cash and cash equivalents of $114.6 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments

> of $151.9 million. We believe our cash and cash equivalents will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Quarterly Report.

***September 12, 2023 Key Opinion Leader Webinar***

118. On September 12, 2023, Humacyte hosted a key opinion leader webinar (the "September 12, 2023 KOL Webinar") concerning the release of top-line data from the V005 Phase 2/3 clinical trial. During the webinar, Dr. Shamik Parikh, Humacyte's Chief Medical Officer ("CMO"), made numerous representations regarding the HAV's safety and efficacy and the allegedly favorable results of the trial.

119. During the same webinar, Defendant Niklason was asked about the Company's comparison of the V005 Phase 2/3 trial results with historical data. She responded:

> So yes, so the historical comparator data set, I looked at the world's literature of using synthetic grafts to treat extremity vascular trauma, upper and lower extremity, over the last 20 years. We actually worked out the protocol for doing the meta analysis with the agency before we performed it. And we've already submitted the results of the meta analysis to the agency. So we have a high degree of confidence, that the agency will accept this benchmark, given that it was developed in collaboration with folks of the FDA.

120. In response to additional questions concerning patient follow-up and outcomes, Defendant Niklason stated:

> I would say that in terms of the decision of which conduit to use in the setting of acute injury, the caregivers are primarily interested in saving life and limb, and getting the patient out of the operating room as quickly as possible. So certainly, long-term patency is a factor. But in the setting of trauma, it is not the primary factor. The primary factor is saving life and limb at the time of the acute crisis. And this is why the FDA has acknowledged that 30-day patency is actually a salient endpoint. It's a clinically meaningful endpoint in the trauma population. So while we expect that our longer-term outcomes will be good, based on what we've seen in the PAD literature, we also believe that in the trauma population, short-term endpoints matter a lot.

121. When asked about the composition of the V017 Ukraine trial, Defendant Niklason responded: "even though this was not a clinical trial per se, but the inclusion criteria for the humanitarian effort, actually mirrored the inclusion criteria for the V005 trial."

122. Defendant Niklason also made representations regarding the Durham Facility's manufacturing capabilities, quality, and readiness, stating:

> [O]ur manufacturing system, called the Luna200 system, which allows us to make HAVs at commercial scale, has already been in use. We've been using this system to produce vessels for our ongoing clinical trials since the middle of 2021.
>
> As part of transitioning to that commercial scale system, we did a very detailed filing to our IND with the FDA back in 2020. And they reviewed that filing and have given us a sign-off to use our current commercial system in our clinical studies.
>
> ***
>
> [W]e're currently using systems that allow us to perform commercial scale manufacturing. And the total capacity in the building in which we now occupy, will allow us to produce approximately $1 billion worth of product, when we're fully built out.

***September 20, 2023 Live Key Opinion Leader Event***

123. On September 20, 2023, Humacyte conducted a live key opinion leader event in New York City (the "KOL Event"). At the event, Defendant Niklason stated:

> So how did we do? Well, when we look at how well blood flow was performing in the HAV after 30 days after implant, what we saw is that roughly 90% of patients had good blood flow at the 30-day endpoint. When we compare that to what's been published in the literature with synthetic grafts or plastic grafts that you can also pull off-the-shelf, that number came in around 81%, which means that our patency values were substantially better than those that have been reported for synthetic grafts, so that's already - in our view, that's already a win.
>
> If you can pull an HAV off-the-shelf or you pull a synthetic graft off-the-shelf, if you pull the HAV off-the-shelf, the patient is about half as likely to lose their blood flow. So that's - in my view, that's win #1.
>
> Win #2 is at least as important and probably more important. So if we look at the rate of amputation in patients who have injuries in their limbs, and were treated

> with plastic grafts off the shelf. What we see is that, that amputation rate was about 20%, 21%, which means 1 in 5 patients who get an injury like this who are treated with the plastic graft will go on to amputation.
>
> In our study with a lot of very sick patients, what we saw was slightly less than 10% of patients went on to amputation.
>
> ***
>
> [W]hat I can tell you is that for every single patient in our trial, if they had an amputation, it was in the setting of the HAV working, but the patient's limb was just too badly damaged.
>
> ***
>
> Avoiding infection, being able to resist getting infected if you're putting an HAV into a wound that has contamination. Avoiding infection is important. And what we saw is that our infection rate was only 2% in the first month and the synthetic grafts were almost 10%. So there was a more than fourfold improvement in your risk of infection.

124. Regarding the purported results of the V017 Ukraine trial, Defendant Niklason additionally stated: "All of these patients were viewed by the surgeons as not having any vein. So I think a lot of these patients would have had to undergo amputation if they had not had the HAV. What I can tell you is that in the 19 patients we treated, we had O amputations, and 100% limb salvage, and we had O infections."

***Third Quarter 2023 Financial Results***

125. On November 9, 2023, Humacyte issued a press release reporting its financial results for the third quarter ended September 30, 2023 (the "November 9, 2023 Press Release"). The release announced positive top-line HAV results, stating in relevant part:

> **Positive Phase 2/3 Trauma Results** - In September 2023, Humacyte announced positive top line results from its V005 Phase 2/3 trial of the HAV in vascular trauma repair. In this single-arm clinical trial, the HAV had higher rates of patency, and lower rates of amputation and infection, compared to historic synthetic graft benchmarks. A total of 69 patients were enrolled in the V005 trial, of which 51 had vascular injury of the extremities and comprised the primary evaluation group for the study. The 30-day patency (presence of blood flow) for the HAV in the clinical

> trial was 90.2% for the extremity patients compared to approximately 81% historically reported for synthetic grafts. The HAV demonstrated lower amputation rates, with a rate of 9.8% compared to over 20% historically reported for synthetic grafts. The HAV also demonstrated lower rates of infection, with a rate of 2.0% compared to over 8% historically reported for synthetic grafts.

126. In a section entitled "Presentation of Success in Treating Wartime Injured in Ukraine," the November 9, 2023 Press Release stated, "Clinicians reported that the rate of success in treating patients with the HAV was high, with an observed 30-day HAV patency of 95%, 30-day limb salvage of 100%, 30-day survival of 100%, and zero cases of infection of the HAV."

127. With respect to Humacyte's liquidity, the November 9, 2023 Press Release stated:

> The Company reported cash and cash equivalents of $100.0 million as of September 30, 2023. In May 2023, Humacyte reported the completion of a funding arrangement of up to $160 million with Oberland Capital Management, $40 million of which has been received. Total net cash used was $49.4 million for the first nine months of 2023, compared to $53.8 million for the first nine months of 2022. Humacyte believes that its cash and cash equivalents and expected funding from the Oberland arrangement are adequate to finance operations past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.

128. During the related November 9, 2023 Earnings Call, Defendant Niklason reiterated the Company's favorable characterization of the V005 Phase 2/3 clinical trial, stating:

> I'll begin with our HAV program in vascular trauma and the positive top line results that we announced from our V005 Phase 2/3 clinical trial of the HAV in trauma repair. In this clinical trial, the HAV had higher rates of patency and lower rates of amputation and infection as compared to historical published benchmarks of synthetic graft function in trauma patients.
>
> A total of 69 patients were enrolled in the V005 trial, and 51 of these had vascular injury of the extremities and comprise the primary evaluation group for the study. The 30-day patency or presence of blood flow for the HAV in the clinical trial was 90% as compared to approximately 81% historically reported for synthetic graphs. Importantly, the HAV also demonstrated lower amputation rate with a rate of 9.8% for the HAV as compared to over 20% being reported historically for synthetic graft. This means that for avascular trauma patient receiving the HAV, the chances

> of amputation are less than half of the chances associated with receiving a synthetic graft.
>
> It's also important to note that in the V005 trial, there were no amputations that occurred because of failure of HAV. All of the amputations occurred because of severe injuries to the limb and not due to loss of blood flow from the HAV implant.
>
> The HAV also demonstrated lower rates of infection, with an infection rate of 2% compared to over 8% historically reported for synthetic graft. In other words, patients receiving the HAV in this trial were less than half [a]s likely to suffer an amputation, and one-fourth [a]s likely to have an infection of their graft as patients who historically got synthetic graphs for their injuries.

129. Defendant Niklason likewise characterized the V017 Ukraine trial results favorably, stating:

> In war[-]wounded patients in Ukraine, who suffered blast and shrapnel injuries that were often severe, both a 30-day limb salvage and 30-day patient survival were 100%. [Thirty]-day patency or blood flow was 95%, and there were no reported instances of infection of the HAV.

130. During the same call, Defendant Sander again represented that Humacyte possessed adequate liquidity, stating:

> As of September 30, 2023, we had cash and cash equivalents of $100 million. In May 2023, we reported the completion of a funding arrangement with Oberland Capital of up to $160 million, of which we have received $40 million to date. Total net cash used was $49.4 million for the first nine months of 2023, compared to $53.8 million for the first nine months of 2022. We believe that our cash and cash equivalents and expected funding from the Oberland funding arrangement are adequate to finance operations past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.

131. That same day, Humacyte filed its third-quarter Form 10-Q with the SEC (the "Q3 2023 Form 10-Q"). Defendants Niklason and Sander signed the Q3 2023 Form 10-Q and the SOX certifications accompanying the filing.

132. The Q3 2023 Form 10-Q again assured investors that Humacyte had adequate liquidity to fund its operations, stating, among other things:

> As of September 30, 2023, we had cash and cash equivalents of $100.0 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. We believe our cash and cash equivalents will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Quarterly Report.

133. The foregoing representations contained in the August 14, 2023 Press Release, the August 14, 2023 Earnings Call, the September 12, 2023 KOL Webinar, the September 20, 2023 KOL Event, the November 9, 2023 Press Release, and the November 9, 2023 Earnings Call were materially false and misleading because they failed to disclose that the HAV presented significant health and safety concerns, including the risk of rupture and deficiencies in the studies supporting the Company's representations.

134. The August 14, 2023 Press Release, the Q2 2023 Form 10-Q, the November 9, 2023 Press Release, the November 9, 2023 Earnings Call, and the Q3 2023 Form 10-Q were also materially false and misleading concerning Humacyte's liquidity. In reality, the Company had sufficient liquidity to fund its operations only through February 2024. Humacyte ultimately disclosed that liquidity constraint through its February 29, 2024 announcement of a public offering, which closed on March 5, 2024 and involved the issuance of more than 13 million shares at $3.00 per share, a substantial discount to the prevailing market price.

135. Moreover, the September 12, 2023 KOL Webinar was materially false and misleading because it failed to disclose that the Individual Defendants were not adequately exercising their oversight responsibilities concerning mission-critical health and safety matters, including quality assurance and microbial testing at the Durham Facility. Specifically, the webinar failed to disclose that: (i) the Durham Facility was not compliant with good manufacturing practices, including requirements governing quality assurance and microbial testing; (ii) the FDA's review of Humacyte's BLA would be delayed while the Company

remediated those deficiencies; and (iii) those deficiencies created a substantial risk that FDA approval of ATEV for the treatment of vascular trauma would not be obtained.

***November 17, 2023 Press Release Reiterates HAV's Safety & Efficacy***

136. On November 17, 2023, Humacyte issued another press release in which it continued to characterize the HAV as safe and effective (the "November 17, 2023 Press Release"). The November 17, 2023 Press Release announced the presentation of positive results from the V005 Phase 2/3 clinical trial, stating: "Results showed the HAV had higher rates of patency (blood flow), and lower rates of amputation and infection, compared to historic synthetic graft benchmarks… [T]he comparators for the HAV results were a systematic literature review and meta-analysis of studies conducted with synthetics grafts, providing a benchmark for comparison."

137. The November 17, 2023 Press Release further stated, in relevant part:

> The V005 trial met its objectives, and the HAV demonstrated a higher 30-day secondary patency rate of 90.2% for the extremity patients compared to 78.9% historically reported for synthetic grafts. Primary patency for the HAV was 81.2% for the extremity patients, although no comparison to synthetic graft primary patency was possible since this measure was not reported in the benchmark publications. The HAV also demonstrated lower amputation rates, with a rate of 9.8% for extremity patients compared to 24.3% historically reported for synthetic grafts. Furthermore, the HAV demonstrated lower rates of infection, with a rate of 2.0% for the extremity patients compared to 8.4% historically reported for synthetic grafts.
>
> ***
>
> The rate of success for treatment of patients with the HAV in the VO17 trial was high, with a 30-day secondary patency of 93.8%, zero amputations, and zero cases of infection of the HAV. The results of a meta-analysis combining the V005 and VOl 7 trials concluded that the HAY demonstrated higher patency with a 30-day secondary patency rate of 91.5% for the extremity patients compared to 78.9% historically reported for synthetic grafts. For the secondary comparison of amputation rates, the HAV demonstrated an improvement with a rate of 4.5% for extremity patients compared to 24.3% historically reported for synthetic grafts. For the secondary comparison of infection, the HAV demonstrated an improvement

> with a rate of 0.9% for the extremity patients compared to 8.4% historically reported for synthetic grafts.
>
> ***
>
> There were no unexpected safety signals for the HAY in the V005 and VOl 7 studies. Common adverse events reported were anemia, vascular graft thrombosis, blood loss anemia, pyrexia, thrombocytopenia, constipation, nausea peripheral edema, and tachycardia. There were four deaths among the extremity patients in the V005 trial, and zero deaths in the VO17 trial. There were no deaths among extremity patients in the V005 trial attributed to the HAV. A meta-analysis combing the V005 and VO17 trials showed a rate of death for extremity patients comparable to that historically reported for synthetic grafts, with a 30-day rate for the HAV of 3.5%, and a 30-day rate of deaths attributed to the HAV of 0.0%. A 30-day rate of death of 3.4% is reported historically for synthetic grafts, although deaths attributed to the synthetic grafts were not reported.

138. The November 17, 2023 Press Release also represented that Humacyte was prepared to manufacture the HAV at commercial scale, stating: "The HAV can be produced at commercial scale in Humacyte's existing manufacturing facilities, which are expected to have the capacity to provide thousands of vessels for treating patients in need."

139. On December 12, 2023, the Company issued another press release reiterating its favorable representations concerning the HAV and announcing that it had submitted a BLA to the FDA seeking approval of the HAV (the "December 12, 2023 Press Release"). The December 12, 2023 Press Release stated, in relevant part:

> As a single-arm study, the comparators for the HAV results were systematic literature reviews and meta-analysis of studies evaluating synthetic grafts in vascular injury repair. ... The V005 trial met its objectives, and the HAV demonstrated a higher 30-day secondary patency rate of 90.2% for the patients with extremity vascular trauma compared to 78.9% historically reported for synthetic grafts. Primary patency for the HAV was 84.3% for the patients with extremity vascular trauma, although no comparison to synthetic graft primary patency was possible since this measure was not reported in the benchmark publications. The HAV also demonstrated lower amputation rates, with a rate of 9.8% for patients with extremity vascular trauma, compared to 24.3% historically reported for synthetic grafts. Furthermore, the HAV demonstrated lower rates of infection, with a rate of 2.0% for the V005 patients with extremity vascular trauma compared to 8.4% historically reported for synthetic grafts.

***

> A high success rate for patients [from the Ukraine humanitarian program] in the V0l 7 trial was observed, with a 30-day primary and secondary patency of 93.8%, zero amputations, and zero cases of infection of the HAV. An analysis of an integration of results from the V005 and V0l 7 trials concluded that the HAV demonstrated higher patency with a 30-day secondary patency rate of 91.5% for patients with extremity vascular trauma compared to 78.9% historically reported for synthetic grafts. For the secondary comparison of amputation rates, the HAV demonstrated an improvement, with a rate of 4.5% for integrated V005 and V0l 7 results, compared to 24.3% historically reported for synthetic grafts. For the secondary comparison of infection, the HAV demonstrated an improvement, with a rate of 0.9% for integrated data as compared to 8.4% historically reported for synthetic grafts.

***February 9, 2024 Press Release Reiterates HAV's Safety & Efficacy***

140. On February 9, 2024, Humacyte issued another press release portraying the HAV as safe and effective (the “February 9, 2024 Press Release”). The release announced that the FDA had granted priority review to the HAV BLA and again emphasized the product's purportedly favorable clinical profile:

> The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a Humanitarian Aid Program supported by the FDA. The HAV was observed to have higher rates of patency (blood flow), and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks.

141. The February 9, 2024 Press Release also represented that Humacyte’s manufacturing facilities were prepared for commercial production of the HAV, stating: "[t]he HAV can be produced at commercial scale in Humacyte’s existing manufacturing facilities, which are expected to have the capacity to provide thousands of vessels for treating patients in need.”

***Fourth Quarter 2023 and Year-End 2023 Financial Results***

142. On March 22, 2024, Humacyte issued a press release reporting its fourth-quarter and full-year 2023 financial results for the period ended December 31, 2023 (the "March 22, 2024 Press Release"). The March 22, 2024 Press Release stated, in relevant part:

> The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. The HAV was observed to have higher rates of patency (blood flow), and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks in both the V005 Phase 2/3 clinical trial and the Ukraine humanitarian program.
>
> ***
>
> These [two presentations made at the VEITH Symposium] include an expanded presentation of positive results of the V005 vascular trauma trial, with the HAV observed to have higher rates of patency and lower rates of amputation and infection as compared to historic synthetic graft benchmarks.
>
> ***
>
> The Company reported cash and cash equivalents of $80.4 million as of December 31, 2023. In addition, Humacyte completed two transactions in early 2024 which added to its cash balance. On March 5, 2024, the Company closed an underwritten public offering of its common stock and raised net proceeds of approximately $43.1 million. Furthermore, on March 11, 2024, the Company received $20 million in proceeds from an additional draw under its previously disclosed funding arrangement with Oberland Capital Management. Total net cash used was $69.0 million for the year ended December 31, 2023, compared to $67.7 million for the year ended December 31, 2022. Humacyte believes that its cash and cash equivalents, including net proceeds from the March offering and additional draw under the Oberland funding arrangement, will be adequate to finance operations for at least 12 months from the date of this financial report, well past the currently anticipated timelines for FDA approval of commercialization of the HAV in the vascular trauma indication

143. During the related earnings call that same day (the "March 22, 2024 Earnings Call"), Defendant Niklason said the following regarding the success of the HAV and Humacyte's manufacturing readiness:

> Our data package showed that the HAV had higher rates of patency and lower rates of amputation and infection as compared to historic synthetic graft benchmarks. In

the two trials combined, the 30-day patency or presence of blood flow for the HAV was 91.5% for extremity patients compared to 78.9% historically reported for synthetic grafts. The HAV also demonstrated lower amputation rates with a rate of 4.5% as compared to 24.3% for synthetic grafts. And furthermore, the HAV had lower infection rates at 30 days, with a rate of 0.9% as compared to 8.4% historically for synthetic grafts. In other words, patients treated with the HAV were only 40% (a]s likely to lose blood flow through their conduit after one month, which is a key period for recovery after traumatic injury. HAV patients were also only 115th [a]s likely to suffer an amputation and only 119th [a]s likely to have an infection of their graft as compared to patients who were treated with the synthetic graft.

***

[A]fter the BLA file was accepted and we got our PDUFA date in August, the FDA moved rapidly to begin scheduling interim meetings and also our inspection, which is upcoming in the near future. As far as what we've been doing to prepare for this, we've actually run two mock inspections, one last summer and one just last month in February, where we brought consultants in to Humacyte who were all ex-FDA inspectors. And they really did a deep dive on two separate occasions, really helping us be as prepared as possible for this upcoming inspection. ***I would say that since we began preparing for this last summer, we've really been able to execute on all of the remediations that were picked out, certainly from 2023.***

***And we're feeling very confident about how this inspection is going to go. We believe that the facility is in great shape.*** Our manufacturing processes are well characterized and well understood. Obviously, with the Center for Biologics, you’re right, a big focus is always on manufacturing and the facility and the robustness of the process. ***But we believe we're in good shape.***

***

[O]ne of the beauties of the platform, and this was designed with intention, is that our LUNA manufacturing machines, each of which right now can make up to about 1,000 40-centimeter HAVs per year.

***

Right now, we have built out only a fraction of our manufacturing floor because we have eight LUNAs installed, although we have room for 40.

144. During the same call, Defendant Sander talked about the Company’s liquidity as follows:

We had cash and cash equivalents of $80.4 million as of December 31, 2023. We also completed two transactions in early 2024, which added substantially to our cash balances. On March 5, 2024, we closed an underwritten public offering of common stock and raised net proceeds of approximately $43.1 million. In addition, on March 11, 2024, we've received $20 million in proceeds from an additional draw under our revenue purchase agreement with Oberland Capital. Total net cash used was $69.0 million for the year ended December 31, 2023, compared to

$67.7 million for the year ended December 31, 2022. We believe that our cash and cash equivalents are adequate to finance operations well past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.

***

The way we look at it is we ended December 31 with a little more than - well, right around $81 million in cash. And when we add on the $63-plus million that we achieved through the equity financing as well as the additional draw into our Oberland facility. That means we're entering the year with about $144 million in cash, which leaves us very well positioned. Our net cash bum for 2023 rounded to about $69 million. But if you back out the effect of some net financing transactions from an operating cash point of view and from a capital expenditure point of view, we've burned about $73.5 million in 2023 in those activities. So suggesting we're very well positioned with the cash that we have on hand right now.

In terms of how we'll proceed in the upcoming year, we haven't given super specific guidance, but I'll share what we've guided in the past is that certainly, we expect to expand our commercialization activities during the year, including near the time of launch, bringing on a relatively small sales force to address this very concentrated market. So we will have, obviously, higher commercialization expenses during this year. But we do also have a wind down of certain clinical costs during the year with the V005 study just in long-term follow-up and not as intensive activities as we had during 2023 as we prepared for the close out of that study and for filing of the BLA. And then also our dialysis trial [V007] will be winding down in the second half of the year, too.

So we expect somewhat of an increase in overall cash bum for the upcoming year, but not to a great extent on a net basis. And we believe that the cash on hand is certainly adequate to take us well past the commercial launches in trauma and AV access and well passed or certainly through 2026. So we certainly don't have any cash concerns at this point in time.

145. On March 28, 2024, Humacyte filed its annual Form 10-K with the SEC (the "2023 Form 10-K"). Defendants Niklason and Sander signed the 2023 Form 10-K and the SOX certifications accompanying the filing. The 2023 Form 10-K stated the following:

> Overall, the HAV has functioned well and as intended, across ten different clinical trials in three clinical indications. The HAV has been implanted in approximately 573 patients, across more than 85 clinical sites in seven countries, over more than ten years (as of December 31, 2023). Rates of primary and secondary patency were similar across trial designs and disease states, with 30-day primary patency ranging from 84% - 100%. Six-month secondary patency ranges from 84% - 100%, and 12-month secondary patency ranges from 81% - 97%, across multiple clinical trials, disease states, and patient age ranges and demographics.
>
> We have observed zero instances of clinical rejection of the HAV in any clinical trial over the past ten years, suggesting that the HAV was not immunologically rejected after implantation.
>
> Based on clinical trial results to date, we have observed that the HAVs were highly resistant to infection, with an infection rate averaging approximately 1.0% per patient-year in our AV access trials, and low infection rates currently in our trauma and PAD trials.
>
> The laboratory results suggest that the bioengineered human tissue of the HAV may have superior compatibility with the body's own white blood cells as compared to ePTFE.
>
> ***
>
> Trial Design [for the V005 Phase 2/3 Trial for Vascular Trauma trial]: Our V005 trial is a single-arm, multi-center, non-randomized clinical trial to evaluate the efficacy, safety[,] and tolerability of our 6 millimeter HAV in replacement or reconstruction of vascular tissues in patients with life or limb-threatening vascular trauma for whom the standard of care, saphenous vein, was not feasible or available for vascular repair. As a single-arm study, the comparators for the HAV results were systematic literature reviews and meta-analysis of studies evaluating synthetic grafts in vascular injury repair. A total of 72 patients were enrolled in the V005 trial, of which 51 had vascular injury of the extremities and comprised the primary evaluation group for the study. The primary efficacy endpoint was patency of the HAV at 30 days, with 30-day rates of infection and amputation comprising the secondary endpoints.
>
> ***

The safety profile of the HAV in the V005 trial was consistent with previous studies and there were no cases of clinical rejection of the HAV. A summary of adverse events for the duration of the study (mean duration of follow up is 295 days) is included in the table below.

*V005 Phase 2/3 HAV Adverse Events*

| Adverse Event | V005 Trial - HAV Extremity Group (n=51) Number of Patients (%) |
|---|---|
| Total Adverse Events | 50 (98.0%) |
| Non-Fatal Serious Adverse Events | 28 (54.9%) |
| Deaths: | |
| At Day 30 | 3 (5.9%) |
| Over Duration of Study | 4 (7.8%) |
| HAV Infections | 2 (3.9%) |
| HAV Rupture | 1 (2.0%) |
| HAV Occlusion/Thrombosis | 15 (29.4%) |
| Pseudoaneurysm | 1 (2.0%) |
| Aneurysm | 1 (2.0%) |
| Other | 2 (3.9%) |

There were no unexpected safety signals for the HAV in the V005 trial. The most common adverse events were thrombosis, anemia, pyrexia, thrombocytopenia, constipation, nausea, peripheral edema, and tachycardia. The most common non-fatal Serious Adverse Events were thrombosis, anastomotic stenosis, wound infection, muscle necrosis, wound infection, hemorrhage shock, and cardiac arrest. Deaths occurring prior to day 30 were adjudicated as not casually related to the HAV by an Independent Adjudication Committee.

***

A high success rate for the 16 extremity patients in the V0l 7 [Ukraine] trial was observed, despite the presence of contaminated wound beds, as summarized in the table below.

*V017 Ukraine Humanitarian HAV Results in Vascular Trauma*

| 30-Day Endpoint | V017 Trial HAV Extremity Group (%) |
|---|---|
| Primary Patency | 93.8% |
| Secondary Patency | 93.8% |
| Conduit Infections | 0.0% |
| Amputations | 0.0% |

The safety profile of the HAV in the VO17 trial was consistent with previous studies and there were no cases of clinical rejection of the HAV. A summary of adverse events for the duration of the study (mean duration of follow up is 139 days) is included in the table below.

*V017 Ukraine Humanitarian HAV Adverse Events*

| Adverse Event | V017 Trial - HAV Extremity Group (n=16) Number of Patients (%) |
|---|---|
| Total Adverse Events | 4 (25.0%) |
| Non-Fatal Serious Adverse Events | 1 (6.3%) |
| Deaths: | |
| At Day 30 | 0 (0.0%) |
| Over Duration of Study | 0 (0.0%) |
| HAV Infections | 0 (0.0%) |
| HAV Rupture* | 1 (6.3%) |
| HAV Occlusion/Thrombosis | 1 (6.3%) |
| Pseudoaneurysm | 0 (0.0%) |
| Aneurysm | 0 (0.0%) |

*One HAV rupture associated with extensive shrapnel remnants that caused bleeding.

*Combined V005 and V017 Results of HAV for Vascular Trauma*

The BLA submission is supported by the combined results from the V005 Phase 2/3 clinical trial and real-world outcomes from the treatment of wartime injuries in Ukraine in the VO17 trial. Combined results included in the BLA submission to the FDA, and presented in VEITH symposium, are summarized in the following table.

*Combined V005 Phase 2/3 HAV and V017 Ukraine Real-World Results in Vascular Trauma Compared to Synthetic Graft Benchmark*

| 30-Day Endpoint | V005 Trial HAV Extremity Group (%) | Synthetic Graft Benchmark (%) |
|---|---|---|
| Secondary Patency | 91.5% | 78.9% |
| Conduit Infections | 0.9% | 8.4% |
| Amputations | 4.5% | 24.3% |

The HAV demonstrated a higher 30-day secondary patency rate, and patients treated with the HAV were only 40% as likely to lose blood flow through their conduit after one month compared to the rate historically reported for synthetic grafts, which is a key period for recovery after traumatic injury. In addition, patients treated with the HAV had approximately 1/5 the amputation rate, and approximately 1/9 rate of infection compared to that historically reported for synthetic grafts.[2]

[2] Notably, the Honorable Thomas D. Schroeder found, *inter alia*, that in the Company's 2023 Form 10-K, "Humacyte reported only one rupture among the extremity group (Doc. 41-1 at 197), whereas the FDA reviewer concluded in the Clinical Review Memorandum that four patients from the extremity group lost "SYMVESS integrity" because of rupture, along with three patients in the torso/iatogenic group (*id*. at 19, 142)." Order at *44. The court went on to find that "given the FDA's revised data, Symvess did not represent a safer alternative to existing treatment methods, and the 'serious risk of arterial bleeding from mid-graft rupture or anastomotic failure' warranted a black-box warning." *Id*. at 45 (citations omitted). The court concluded that plaintiffs had adequately alleged that the Company had "inaccurately reported the ruptures in the v005 trial," and that because the Company had "favorably presented the results of the v005 and v017 trials in comparison to the benchmark literature review of synthetic grafts," the defendants had a duty "to disclose the limitations of the while-on-treatment approach." *Id*. at 48–49. These allegations were enough to sustain plaintiffs' claims that "defendants' misstatements and omissions misled investors that Symvess represented a more effective and safer alternative to synthetic grafts. And because a reasonable investor would have considered these facts important in deciding whether to buy or sell Humacyte stock or would have found the total mix of information significantly altered by these

146. Regarding Humacyte's manufacturing process and the Durhan facility, the 2023 Form 10-K stated:

> ***Our Novel Manufacturing Paradigm***
>
> We have developed a novel paradigm for manufacturing human tissues that is intended to mimic key aspects of human physiology. Our proprietary manufacturing process was designed with a modular approach allowing us to produce HAVs in smaller batches for clinical trials and scale out to larger batches for commercial manufacturing. The manufacturing system used to supply our clinical trials from 2016 to 2021, including our Phase 3 trials conducted during that time period, utilized a single tray within one growth drawer holding ten HAVs per batch. In 2021 we commenced supplying our ongoing clinical trials with HAVs produced in our current, commercial-scale LUNA200 system, which consists of 20 growth drawers per production unit for a total of 200 HAVs per batch. Each growth drawer is capable of producing ten 42cm HAVs, each of which is contained within an individual bioreactor bag. Inside a LUNA200, a tubing network connects all HAVs, allowing the entire system to share nutritive media. In this way, a single LUNA200 can produce up to 200 HAVs (42cm in length) per batch while maintaining the critical operating parameters, such as biomechanical pulsing, that affect growth.
>
> ***
>
> Our current 83,000 square foot manufacturing facility has space to further expand manufacturing capacity as needed to over 40 LUNA200 systems. Currently, eight LUNA200 systems are installed and operational.
>
> ***
>
> We have designed our manufacturing system to be functionally closed, to utilize single-use disposable materials with aseptic connections, and to be fully automated, which allows us to control and maximize HAV production.
>
> ***
>
> Recognizing that commercial scale production capacity of bioengineered tissue has been non-existent, we prioritized the development of a scalable, reproduceable, commercial biomanufacturing process. At our 83,000 square foot manufacturing

---

facts," that those misleading statements or omissions were material. *Id.* at 49. The court further found that the complaint in the Securities Class Action, holistically, created "an inference of wrongdoing that is at least as likely as any opposing, innocent explanation," and therefore, plaintiffs had established an inference of scienter. *Id.* at 54–55.

> facility in Durham, North Carolina, we have industrialized this concept and created a scalable modular manufacturing process that enables us to engineer our HAVs in commercial quantities in a system designed for cGMP compliance.
>
> ***
>
> A thorough comparability assessment was performed to evaluate HAV batches produced in the single-drawer system versus batches produced in the [Company's] 20-drawer LUNA200 system. The study assessed 22 separate comparisons on the identity, strength, quality, purity, and potency of the HAV product. In this study, we observed that HAVs produced in the LUNA200 system were comparable to HAVs produced in the single-drawer system. Additionally, a crossover study, called V0l 1, enrolled 30 subjects to evaluate HAVs that were manufactured on Humacyte's commercial LUNA200 platform with the primary goal to evaluate the safety, efficacy[,] and immunogenicity of the LUNA200-manufactured HAVs. In this trial we observed comparable safety profile between HAV used in previous studies and the HAY manufactured in the LUNA200 commercial system. The results of the comparability assessment and from the VO11 crossover study were submitted to the FDA. In 2021, the FDA authorized the use of HAVs produced in the commercial LUNA200 system to supply our ongoing clinical trials. We plan to also use the LUNA200 system for anticipated commercial launches of the HAV if it is approved.
>
> ***
>
> We have designed the LUNA200 to have the ability to produce HAVs in diameter sizes from 3mm to 10mm and lengths from 10cm to 42cm, making the equipment suitable for the varied array of product candidates in our pipeline. We intend to introduce a 13cm HAV line extension after commercial launch of the 42cm HAV. Using our existing LUNA manufacturing equipment, we can generate 400 13cm HAVs per batch. Our modular manufacturing platform can be scaled without impacting the operating parameters that support the HAV growth process.
>
> ***
>
> We currently have eight LUNA200 systems installed, commissioned[,] and qualified in our manufacturing facility, creating an annual gross HAV capacity of approximately 7,200 HAVs.

147. The 2023 Form 10-K likewise represented that the Company possessed adequate liquidity to continue funding its operations. Among other things, it stated:

> As of December 31, 2023, we had cash and cash equivalents of $80.4 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. Subsequent to December 31, 2023, in March 2024

> we completed the Offering [of 15,410,000 shares of common stock at $3.00 per share], which provided approximately $43.1 million in net proceeds and received an additional $20.0 million under the Purchase Agreement []. Based upon our current operating plan, we believe that our cash and cash equivalents will be sufficient to fund our operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Annual Report on Form 10-K.

148. The foregoing representations in the November 17, 2023 Press Release, the December 12, 2023 Press Release, the February 9, 2023 Press Release, the March 22, 2024 Press Release, the March 22, 2024 Earnings Call, and the 2023 Form 10-K were materially false and misleading because they failed to inform investors that the HAV was subject to serious health and safety concerns, including the risk of rupture and deficiencies in the underlying studies.

***The 2024 Proxy Statement***

149. On April 29, 2024, Humacyte filed a Schedule 14A with the SEC (the "2024 Proxy Statement"). Defendants Brown, Constantino, Dougan, Green, Niklason, Pope, Sebelius, Seimetz, Wallace, and Windham-Bannister, together with then-directors Gordon Binder and Rajiv Shukla, who were not parties to this action, solicited the 2024 Proxy Statement which contained material misstatements and omissions.

150. The 2024 Proxy Statement solicited Humacyte stockholders' votes on, among other matters: (1) the election of Bamforth, Brown, Constantino, Jones, Niklason, and Windham-Bannister to the Board for three-year terms expiring at the 2027 annual meeting; and (2) ratification of the appointment of PricewaterhouseCoopers LLP as Humacyte's independent registered public accounting firm for the fiscal year ending December 31, 2024.

151. With respect to the Company's Code of Business Conduct and Ethics, the 2024 Proxy Statement stated:

> **Code of Business Conduct and Ethics**

> We have adopted a Code of Conduct [] that applies to all officers, directors[,] and employees of Humacyte and its subsidiaries. The Code of Conduct [] codifies the business and ethical principles that govern all aspects of our business, reflecting our commitment to a culture of honesty, integrity[,] and accountability. In addition to following the Code of Conduct [], officers, directors[,] and employees are expected to seek guidance in situations where there is a question regarding compliance issues, whether with the letter or the spirit of our policies and applicable laws. The Code of Conduct [] is available on the investors section of our website at www.humacyte.com

152. The 2024 Proxy Statement also described the responsibilities of the Audit Committee, stating:

> The Audit Committee has the following responsibilities, among others, as set forth in the [Audit Charter]:
>
> - selecting a firm to serve as the independent registered public accounting firm to audit our financial statements;
> - ensuring the independence of the independent registered public accounting firm;
> - discussing the scope and results of the audit with the independent registered public accounting firm and reviewing, with management and that firm, our interim and year-end operating results;
> - establishing procedures for employees to anonymously submit concerns about questionable accounting or audit matters;
> - considering the adequacy of our internal controls;
> - reviewing material related party transactions or those that require disclosure;
> - pre-approving audit and non-audit services to be performed by the independent registered public accounting firm; and
> - oversee[ing] our risk management process, including with respect to cybersecurity, and our process for preventing and detecting fraud.

153. The 2024 Proxy Statement further represented that the Company's Commercial Committee "oversees issues related to manufacturing, pricing, market access, and sales."

154. With respect to the Company's risk oversight responsibilities, the 2024 Proxy

Statement stated:

> **Risk Oversight**
>
> The Board recognizes that the leadership structure and combination or separation of the CEO and Chair roles is driven by the needs of Humacyte at any point in time. As a result, no policy exists requiring combination or separation of leadership roles, and our governing documents do not mandate a particular structure. The Board believes this structure will allow it the flexibility to establish the most appropriate structure for Humacyte at any given time.
>
> The Board oversees the risk management activities designed and implemented by our management. Management, the Board[,] and its committees work together to manage risks and the opportunities these create. The Board does not have a standing risk management committee, but rather executes its oversight responsibility both directly and through its standing committees. The Board also considers specific risk topics, including risks associated with our strategic initiatives, business plans, capital structure, commercializing our product candidates, liquidity, talent management, compliance[,] and cybersecurity. Our management, including our executive officers, are primarily responsible for managing the risks associated with the business and operations of the [C]ompany and provide appropriate updates to the Board and the Audit Committee. Our management annually reports to the Board the results of its internal survey and analysis of enterprise risk management and regularly discusses with the Board and its committees various operational and compliance risks. The Board has delegated to the Audit Committee oversight of its risk management process, and the other committees of the Board also consider risks as they perform their respective committee responsibilities. All Board committees report to the Board as appropriate, including, but not limited to, when a matter rises to the level of a material or enterprise risk.
>
> While management is responsible for the day-to-day risk management process, the role of the Board, either acting as the full Board or through its committees, is to ensure that:
>
> - the risk management process designed and implemented by management is adapted to the overall corporate strategy;
> - those processes are functioning effectively:
> - management communicates material risks to the Board or the appropriate committee; and
> - actions are being taken to continue to foster a strong culture of compliance and risk-adjusted decision making throughout Humacyte.

155. The 2024 Proxy Statement also described the Board's corporate objectives for

2023 and stated that the Compensation Committee determined that "all [named executive officers] were instrumental in meeting [Humacyte's] corporate objectives." Those objectives included:

**Corporate Objectives**

- Ensure (i) submission to the [FDA] of a [BLA] for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible, and (ii) FDA acceptance of the BLA filing.

- Advance approval of the HAV for use in arteriovenous ("AV") access for hemodialysis by, among other items, (i) reaching agreement with the FDA on a BLA filing strategy, (ii) completing enrollment of the V007 Phase 3 clinical trial[,] and (iii) reaching agreement with the FDA on the clinical trial protocol for our V012 Phase 3 clinical trial and commencing enrollment.

***

- Complete all necessary activities to prepare for a potential market launch of the HAV in the vascular trauma indication.

- Maintain financial stability through strong adherence to budget, by managing and expanding capital and enhancing access to lending.

156. The 2024 Proxy Statement was materially misleading because it omitted that: (i) notwithstanding Humacyte's representations that its officers and directors complied with the Code of Conduct, the Individual Defendants were violating that Code; (ii) contrary to the Proxy Statement's assertion that the named executive officers had achieved the Company's 2023 corporate objectives concerning the HAV's regulatory submissions and approval, preparedness for commercial launch, and financial stability, those objectives had not, in fact, been achieved; and (iii) contrary to the Proxy Statement's description of the Board's risk oversight responsibilities, the Board and its committees failed to adequately perform those functions and thereby caused or permitted Humacyte to disseminate false and misleading statements.

157. The 2024 Proxy Statement was further materially misleading because it failed to disclose to investors, *inter alia*, that: (i) the HAV was subject to serious health and safety concerns, including the risk of rupture and deficiencies in the studies; and (ii) that the Individual Defendants failed to discharge their oversight responsibilities concerning mission-critical health and safety matters involving quality assurance and microbial testing at the Durham Facility.

***First Quarter 2024 Financial Results***

158. On May 10, 2024, Humacyte issued a press release reporting its financial results for the first quarter ended March 31, 2024 (the "May 10, 2024 Press Release"). In that release, Defendant Niklason represented, among other things, that the Company was "on track with [its] BLA review and commercial launch preparations and remain[ed] confident in the approvability of the HAY in vascular trauma." The May 10, 2024 Press Release stated, in relevant part:

> **Humacyte First Quarter 2024 Financial Results and Business Update**
>
> *-Biologics License Application (ELA) for HAVTM Accepted by FDA-*
>
> *-ELA Granted Priority Review for Vascular Trauma Indication; PDUFA date set for August 10, 2024-*
>
> *-Raised approximately $43 million in net proceeds from public offering of common stock-*
>
> ***
>
> "During the first quarter of 2024, we achieved a major milestone with the acceptance by the [FDA] of our [BLA] seeking approval of the HAV in the vascular trauma indication," said [Niklason, Humacyte's CEO]. "The FDA's decision to grant Priority Review sets a [PDUFA] date of August 10, 2024, and the entire Humacyte team is working to support our planned U.S. market launch. Among our recent accomplishments is the completion of a Budget Impact Model illustrating the potential economic value of the HAV compared to current standard of care in vascular trauma. In addition, the FDA completed its Pre-Licensing Inspection of our manufacturing facilities in Durham, North Carolina as part of the BLA review process. We remain on track with our BLA review and commercial launch preparations and remain confident in the approvability of the HAV in vascular trauma."

***

> In February 2024, the FDA accepted and granted Priority Review to Humacyte's BLA seeking approval of the HAY in urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use not feasible. The BLA submission is supported by positive results from the Y005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. The HAY was observed to have higher rates of patency, or blood flow, and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks.

159. During the associated earnings call (the "May 10, 2024 Earnings Call"), Defendant Niklason discussed the Company's progress on its BLA submission and again assured investors that the "FDA ha[d] completed its pre-licensing inspection of[its] manufacturing facilities in Durham, North Carolina as part of the BLA review process" and that Humacyte "remain[ed] on track with [its] BLA review and commercial launch preparations, and [it] remain[ed] confident in the approvability of the HAY in vascular trauma." Niklason stated:

> I'll begin with our HAY program in vascular trauma. You'll recall that in December of 2023, we submitted our BLA to the FDA. During our last quarterly call, we discussed in detail the robust data package supporting our submission, which included positive results from our Y005 Phase 2/3 clinical trial as well as real-world evidence from the treatment of wartime injuries in Ukraine under the humanitarian aid program that was supported by the FDA.
>
> In February of 2024[,] the FDA accepted our BLA in vascular trauma, granting Priority Review and establishing a PDUFA goal date for action of August 10th. The FDA has completed its pre-licensing inspection of our manufacturing facilities in Durham, North Carolina as part of the BLA review process. We remain on track with our BLA review and commercial launch preparations, and we remain confident in the approvability of the HAV in vascular trauma.

***

> Based on the strength of our BLA data package, combined with our Priority Review and the RMAT designation from the FDA, we're looking forward to the PDUFA date.

***May 13, 2024 Quarterly Report***

160. On May 13, 2024, Humacyte filed its first-quarter Form 10-Q with the SEC (the "Q1 2024 Form 10-Q"). Defendants Niklason and Sander signed the 1I 2024 Form 10-Q, which also contained SOX certifications executed by both individuals.

161. The Q1 2024 Form 10-Q purported to caution investors regarding risks that, as alleged herein, had already materialized. It identified, among the "numerous risks and uncertainties associated with the development of [the Company's] products":

> • the timing, receipt[,] and terms of any marketing approvals from applicable regulatory authorities including the FDA and non-US. regulators;
>
> ***
>
> • development of clinical and commercial manufacturing capabilities or making arrangements with third-party manufacturers in order to ensure that it or its third-party manufacturers are able to successfully manufacture our product;
>
> ***
>
> A change in the outcome of any of these variables could lead to significant changes in the costs and timing associated with the development of our product candidates. For example, if the FDA or another regulatory authority were to require us to conduct clinical trials beyond those that we currently anticipate being required to conduct in order to complete the clinical development of any of our product candidates, or if we experience significant delays in the enrollment or the conduct of any of our clinical trials, we could be required to expend significant additional financial resources and time on the completion of clinical development.

162. The Q1 2024 Form 10-Q also purported to provide an overview of the Company's operations and the status of its BLA for ATEV. It stated, in relevant part:

> In September 2023, we announced positive topline results from our V005 Phase 2/3 trial in vascular trauma, and in December 2023, we filed a BLA for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible. In February 2024, the FDA accepted the BLA filing and granted priority review and set a [PDUFA] date of August 10, 2024.

163. The foregoing statements in the May 10, 2024 Press Release, the May 10, 2024

Earnings Call, and the Q1 2024 Form 10-Q were materially false and misleading because they failed to disclose that the HAV was subject to serious health and safety issues, including the risk of rupture and deficiencies in the underlying studies.

***June 6, 2024 Jefferies Global Healthcare Conference***

164. On June 6, 2024, Humacyte presented at the Jefferies Global Healthcare Conference (the "Jefferies Conference"). During the presentation, Niklason stated:

> [S]urgeons in Ukraine treated a total of 19 patients over a yearlong humanitarian effort, and you can see the outcomes there. Out of those patients, 94% retained blood flow through the graft after a month, which was our primary endpoint. But in addition, none of those patients suffered amputation and none of those patients suffered infection of their vascular conduit. And that was an impressive result... Okay. So the patency number's about 91.5% at 30 days, and that compared well to 79% with synthetic grafts. But probably more importantly, the infection rate with our vessels was only about one-ninth the infection rate of synthetic grafts. This was not surprising to us based on what we knew about our product. And lastly and most importantly, the risk of amputation was about one-fifth. So historically, if you were a patient who had an extremity wound and you got a plastic graft to restore blood flow, you had about a one in four chance of having that limb amputated. In our case, if they got our vessel, you had a 1 in 20 chance of having your limb amputated. So these are the data that really provided the undergird of the BLA filing that went in, in December.
>
> ***
>
> So as I mentioned, we filed in December. The BLA package was accepted by the FDA in February. As we let investors know in our May quarterly earnings call, we completed an inspection of our facility by the FDA in April, and we've been continuing to march through our interactions with the FDA and we look forward with enthusiasm to our August 10 PDUFA date.

***June 17, 2024 Press Release***

165. On June 17, 2024, Humacyte issued a press release asserting that its manufacturing facilities were ready and capable of supporting commercial production (the "June 17, 2024 Press Release"). The June 17, 2024 Press Release claimed: "The [C]ompany's manufacturing facilities are capable of producing ATEVs at commercial scale to meet the

potential needs of thousands of patients."

166. The statements made during the Jefferies Conference and in the June 17, 2024 Press Release were materially false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, including the risk of rupture and flaws in the studies.

## THE TRUTH BEGINS TO EMERGE

***August 9, 2024 Press Release***

167. Investors began to learn the truth on August 9, 2024, when Humacyte issued a press release announcing that the FDA required additional time to complete its review of the Company's BLA, while simultaneously maintaining that, based on its interactions with the FDA, Humacyte remained confident "in the approvability of the ATEV in treating vascular trauma." (the "August 9, 2024 Press Release"). Regarding the safety and efficacy of the HAV, the August 9, 2024 Press Release stated, in pertinent part:

> Humacyte's BLA included positive results from the V005 pivotal Phase 2/3 clinical study, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. ATEV was used to repair many types of traumatic injuries including car accidents, gunshot wounds, blast wounds and industrial accidents. It was utilized by vascular and trauma surgeons in Level 1 Trauma centers throughout the U.S. and Israel to repair severe limb-threatening and life-threatening injuries, and in front-line hospitals in Ukraine to treat war injuries. In both the civilian and military clinical studies, ATEV was observed to have high rates of patency, or blood flow, and low rates of amputation and infection.

168. Regarding the Company's manufacturing readiness, the August 9, 2024 Press Release stated:

> Humacyte, Inc. (Nasdaq: HUMA), a clinical-stage biotechnology platform company developing universally implantable, bioengineered human tissues at commercial scale, today announced that the [FDA] will require additional time to complete its review of its [BLA] for the acellular tissue engineered vessel (ATEV) in the vascular trauma indication. The ATEV trauma program BLA was submitted to FDA in December 2023, and the FDA granted a Priority Review in February

> 2024 and assigned a PDUFA date of August 10, 2024. In a phone call from FDA CBER leadership today, the Company was informed that the FDA required additional time to complete its review.
>
> "We received a call from FDA CBER leadership this afternoon apologizing to us and stating that additional time was required for review." said [Niklason, Humacyte's CEO]. "FDA leadership noted that Humacyte's ATEV is a first-in-class product, and that Priority Review had been granted, which allows only a six-month review cycle, as compared to the standard ten-month review cycle for most products. During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions. Based on these interactions, we are confident in the approvability of the ATEV in treating vascular trauma. The FDA leadership expressed an apology for their inability to complete the review by the PDUFA date, and currently we do not yet have a revised action date.

169. As these statements demonstrate, although the August 9, 2024 Press Release disclosed that the FDA's review of the BLA had been delayed, it nevertheless failed to disclose to investors that the HAV had serious health and safety issues, including the risk of rupture and flaws in the studies. Instead, the Company downplayed the significance of the delay by reiterating that it remained "confident in the approvability of the ATEV in treating vascular trauma."

170. Following news of the delay, Humacyte's stock price declined approximately $1.30, or 16.4%, to close at $6.62 per share on August 12, 2024, on unusually heavy trading volume.

***Second Quarter 2024 Financial Results***

171. On August 13, 2024, Humacyte issued a press release announcing its second quarter 2024 financial results for the period ended June 30, 2024 (the "August 13, 2024 Press Release"). The August 13, 2024 Press Release reiterated that the "FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing" and claimed that these interactions caused the Company to remain "confident in the approvability of the ATEV in treating vascular trauma." The release

stated, in relevant part:

> "We were surprised to be notified by the FDA that they will require additional time to complete their review of the BLA for [Humacyte's] ATEV (acellular tissue engineered vessel) in vascular trauma," said [Niklason, Humacyte's CEO]. "FDA leadership noted that Humacyte's ATEV is a first-in-class product, and that Priority Review had been granted, which involves only a six-month review cycle, as compared to the standard ten-month review cycle for most products. During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions. Based on these interactions, we are confident in the approvability of the ATEV in treating vascular trauma, although we currently do not yet have a revised action date."
>
> ***
>
> On August 9, 2024, in a phone call, [CBER] leadership from the [FDA] notified the Company that the FDA will require additional time to complete its review of the [BLA] for the ATEV in the vascular trauma indication. The ATEV trauma BLA was submitted to FDA in December 2023, FDA granted a Priority Review in February 2024, and assigned a PDUFA date of August 10, 2024.

172. The Company also held a related earnings call on August 13, 2024 (the "August 13, 2024 Earnings Call"). During that call, an analyst asked, "if the FDA does communicate with [Humacyte], ... should we expect a new date for clearance, or will it simply provide a clearance at a future date...." Niklason responded, "I wish I could provide more clarity for this group, but I can't. Again, the phone call from the senior leadership at CBER on Friday said simply that they need more time and they did not give us insight into a new date or how we would be informed." Sander then added, "I think [to] extrapolate from what [Niklason] said, we don't know what the delay will be at this instance[.]"

173. During the same call, Niklason continued to make statements concerning the Company's manufacturing readiness:

> Despite the FDA's delay, I want to emphasize that we remain confident in the approvability of the ATEV in vascular trauma based on our interactions with the agency to date. During the course of the BLA review, the FDA has conducted

> inspections of our manufacturing facilities and our clinical sites. They've also actively engaged with us in multiple discussions regarding the BLA filing, including post-approval marketing and labeling discussions.
>
> ***
>
> So we had a total of five inspections. I would say all of those inspections went very well. In terms of follow-up items, there are - there's a small number of standard follow-up items on assays and CMC having to do with validation of certain methods. But these are sort of standard things that we've worked out with the agency. Some of those were completed pre-PDUFA. Some of those were slated for post-PDUFA. For example, one study is shipping the product during winter, and we couldn't do that until winter, so we agreed to do that in winter. So but these are sort of standard, I don't want to say cookie cutter, but these are standard validation and test procedures that we do not believe are impacting the timing of the file.

174. On August 13, 2024, the Company also filed its second quarter report on Form 10-Q with the SEC for the period ended June 30, 2024 (the "Q2 2024 Form 10-Q"). Niklason and Sander signed the Q2 2024 Form 10-Q, including the SOX certifications accompanying the filing.

175. The Q2 2024 Form 10-Q repeated the risks previously disclosed in the Q1 2024 Form 10-Q purporting to warn investors of risks the Company faced even though those risks had already materialized. The Q2 2024 Form 10-Q included the following "numerous risks and uncertainties associated with the development of [the Company's] products":

> • the timing, receipt[,] and terms of any marketing approvals from applicable regulatory authorities including the FDA and non-US. regulators;
>
> ***
>
> • development of clinical and commercial manufacturing capabilities or making arrangements with third-party manufacturers in order to ensure that it or its third-party manufacturers are able to successfully manufacture our product[.]
>
> ***
>
> A change in the outcome of any of these variables could lead to significant changes in the costs and timing associated with the development of our product candidates. For example, if the FDA or another regulatory authority were to require us to conduct clinical trials beyond those that we currently anticipate being required to conduct in order to complete the clinical development of any of our product

> candidates, or if we experience significant delays in the enrollment or the conduct of any of our clinical trials, we could be required to expend significant additional financial resources and time on the completion of clinical development.

176. Similarly, the Q2 2024 Form 10-Q repeated the statements referenced in its Q1 2024 Form 10-Q purporting to describe an overview of the Company's operations and the progress of its BLA for ATEV, as well as purportedly hypothetical manufacturing risks. The Q2 2024 Form 10-Q also stated, in relevant part:

> We are initially using our proprietary, scientific technology platform to engineer and manufacture ATEVs. Our investigational ATEVs are designed to be easily implanted into any patient without inducing a foreign body response or leading to immune rejection. We are developing a portfolio, or "cabinet", of ATEVs with varying diameters and lengths.
>
> ***
>
> In September 2023, we announced positive topline results from our V005 Phase 2/3 trial in vascular trauma, and in December 2023, we filed a BLA for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible. In February 2024, the FDA accepted the BLA filing and granted priority review and set a [PDUFA] date of August 10, 2024. On August 9, 2024, the FDA informed us that it required additional time to complete its review of the BLA for the vascular trauma indication.

177. The foregoing statements in the August 9, 2024 Press Release, August 13, 2024 Press Release, August 13, 2024 Earnings Call, and Q2 2024 Form 10-Q were materially false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, including the risk of rupture and flaws in the studies.

***Liquidity News Hits the Market***

178. The Q2 2024 Form 10-Q disclosed, contrary to the Company's prior representations, that Humacyte lacked sufficient liquid capital to fund its commercial operations:

> As of June 30, 2024, we had cash and cash equivalents of $93.6 million. The extension of time required by the FDA to review our vascular trauma BLA, and the delay in potential approval, has delayed, among other items, our ability to draw an additional $40.0 million in Purchase Agreement proceeds. Accordingly, we do not

> believe our available cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least one year from the date of this Quarterly Report without achieving approval of the ATEV for vascular trauma and generating sufficient cash flows from commercial sales on a timely basis and/or obtaining additional capital.

179. The Q2 2024 Form 10-Q further disclosed, for the first time, that Humacyte's liquidity position "raised substantial doubt about our ability to continue as a going concern. We will, over the course of the next year, require additional financing to continue our operations." Thus, the filing ultimately revealed that the PDUFA date would be delayed, that Humacyte would be unable to access the contingent funding, and that, absent that funding, the Company lacked sufficient cash and cash equivalents to finance 12 months of operations.

180. Following this disclosure, Humacyte's stock price declined from $6.65 per share at the August 13, 2024 close to $6.01 per share at the August 14, 2024 close, representing a 9.62% decline.

181. On September 24, 2024, Humacyte filed a Form 8-K with the SEC, which was signed by Defendant Sander (the "September 24, 2024 Form 8-K"). The September 24, 2024 Form 8-K disclosed that Humacyte had entered into a purchase agreement and registration rights agreement with Lincoln Park Capital Fund, LLC ("Lincoln Park"). Under those agreements, Humacyte could, in its sole discretion, sell Lincoln Park "shares of the Company's common stock ... having an aggregate value of up to $50,000,000." Those agreements further provided Humacyte with the right to require Lincoln Park to purchase newly issued Humacyte shares, subject to a daily maximum, at a 3% discount to either the lower of the lowest sale price on the purchase date or the average of the three lowest closing sale prices during the preceding 10 days.

182. Following this disclosure, Humacyte's stock price fell from $6.12 per share on September 24, 2024 to $5.46 per share on September 25, 2024, a decline of 10.78%.

183. The foregoing misstatements and disclosures concerning Humacyte's liquidity were accompanied by additional partial corrective disclosures. Most significantly, on October 17, 2024, during market hours, the FDA released its Form 483 Letter. The Form 483 Letter disclosed that, during an FDA inspection conducted from April 1 through April 5, 2024, the FDA had identified multiple violations of the FD&C Act. Among other things, the Form 483 Letter revealed that the Durham Facility lacked "microbial assurance" and "microbial testing," thereby demonstrating deficiencies in the Company's quality-assurance oversight.

184. Following this disclosure, Humacyte's stock price declined by $0.95, or 16.35%, to close at $4.86 per share on October 17, 2024, on unusually heavy trading volume.

***Third Quarter 2024 Financial Results***

185. On November 8, 2024, Humacyte issued a press release reporting its financial results for the third quarter of 2024, which ended September 30, 2024 (the "November 8, 2024 Press Release"). The November 8, 2024 Press Release quoted Defendant Niklason as stating, "Our [BLA] for our ATEV in vascular trauma remains under review by the [FDA]," and "FDA leadership has not provided us a timeline for the completion of their review. As noted in our previous announcements, during the course of the BLA review the FDA conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions. Based on these interactions, we remain confident in the approvability of the ATEV in treating vascular trauma." The press release further stated:

> On August 9, 2024, in a phone call, [CBER] leadership from the FDA notified Humacyte that the FDA will require additional time to complete its review of the Company's BLA for the ATEV in the vascular trauma indication. The ATEV trauma BLA was submitted to FDA in December 2023. [The] FDA granted a Priority Review in February 2024, and assigned an original PDUFA date of August 10, 2024. The FDA has not provided a timeline for the completion of their review.

186. Humacyte also conducted an earnings call that same day (the "November 8, 2024 Earnings Call") during which Defendant Niklason again addressed the FDA's delayed review but did not disclose the safety concerns identified by the FDA's external reviewers, stating:

> During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and our clinical trial sites. They've also actively engaged with us in multiple discussions regarding our BLA filing, including agreement on post-marketing commitments as well as labeling discussions.
>
> We continue to maintain confidence in the approvability of the ATEV in vascular trauma based upon our interactions with the agency to date.

187. In response to a question concerning the PDUFA delay, Defendant Niklason further stated:

> So, since the PDUFA date, and when the FDA told us they needed more time, we've since had occasional what I'm calling pinging.
>
> We reach out to the CBER leadership every few weeks and ask them, offer them material that may help in the review, ask them if they have timelines or questions for us. And we have offered additional material, for example, some of the webinars that we've shown that they've accepted.
>
> But they have not given us a new date, and they have not really engaged in much question asking. I will say that we've gotten a couple requests for sort of standard documentation on the CMC side just in the last couple weeks that our quality team and our CMC team are responding too timely.
>
> But it would be too far to say that we're having substantive discussions with them. We are offering them the material, and they've asked us a couple of paperwork questions.

188. The foregoing statements in the November 8, 2024 Press Release and the November 8, 2024 Earnings Call were false and misleading because, *inter alia*, despite acknowledging the FDA's delayed review, they failed to disclose that the HAV was subject to serious health and safety concerns, including those identified by the FDA's external reviewers.

***November 14, 2024 Press Release Announcing Another Offering***

189. On November 14, 2024, Humacyte issued a press release that finally disclosed the extent of the Company's liquidity problems, while continuing to omit material information concerning the Company's Product Safety Fraud and Facility Fraud (the "November 14, 2024 Press Release"). The November 14, 2024 Press Release announced a $15 million registered direct offering.

190. In the related prospectus supplement, Humacyte stated that it "intend[ed] to use the net proceeds from this offering to fund the development of the product candidates in our pipeline, the planned commercial launch of the ATEV in the vascular trauma indication, if approved, and for working capital and general corporate purposes."

191. Following this announcement, Humacyte's stock price declined from $5.34 per share at the November 13, 2024 close to $4.84 per share on November 14, 2024, representing a 9.36% decrease.

***November 21, 2024 Press Release Touts the Benefits of HAV***

192. On November 21, 2024, Humacyte issued a press release promoting the purported benefits of the HAV (the "November 21, 2024 Press Release"). The press release announced publication of Humacyte's clinical results in *JAMA Surgery* in an article titled "Bioengineered Human Arteries for the Repair of Vascular Injuries." The article identified Niklason and Humacyte's CMO, Dr. Parikh, as contributing authors who "had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis."

193. The November 21, 2024 Press Release described two clinical studies involving the HAV, stating:

The *JAMA Surgery* publication described the results of two studies in which the ATEV was evaluated in patients with extremity vascular trauma. The V005 clinical trial was a single-arm study conducted in the United States and Israel in patients with arterial injuries resulting from gun shots, workplace injuries, car accidents, or other traumatic events for whom the standard of care, saphenous vein, was not feasible or available to use as a bypass graft. The V0l 7 single-arm clinical trial evaluated patient outcomes from a humanitarian program which patients with wartime injuries were treated in Ukraine. As single-arm studies, the comparators for the ATEV results were a systematic literature review and meta-analysis of studies conducted with synthetics grafts, providing a current treatment benchmark comparison. In a meta-analysis combining the V005 and VO17 trials, the ATEV demonstrated higher patency with a 30-day secondary patency rate of91.5% for the extremity patients compared to 78.9% historically reported for synthetic grafts. For the secondary comparison of amputation rates, the ATEV demonstrated an improvement with a rate of 4.5% for extremity patients compared to 24.3% historically reported for synthetic grafts. For the secondary comparison of infection, the ATEV demonstrated an improvement with a reduced rate of 0.9% for the extremity patients compared to 8.4% historically reported for synthetic grafts. In summary, researchers concluded that the 30-day outcomes in civilian and military trauma patients indicate superior secondary patency, limb salvage, and resistance to infection of the ATEV conduit compared to synthetic grafts.

***

Also published were longer-term follow-up results from the V005 and V017 studies. The ATEV was observed to be mechanically durable and does not appear to dilate or become stenotic over time. Long-term outcomes for secondary patency, limb salvage, freedom from conduit infection, and patient survival were evaluated by Kaplan-Meier analysis. The average follow-up duration for patients receiving the ATEV for extremity trauma is 334.4 days, with a total patient exposure of 61.3 years. These results showcased the potential of the ATEV to retain patency over the longer duration of follow up. No ATEV infections or patient deaths were reported after month three.

***

Evaluation of the safety of the ATEV indicated no safety signals attributable to ATEV mechanical weakness, contamination, or immune rejection. Overall, Adverse Events (AEs) and Serious Adverse Events (SAEs) were consistent with patients suffering from acute injuries. Adverse Events of Special Interest (AESis) including thrombosis, rupture, aneurysm, and pseudoaneurysm, occurred at rates that were consistent with reports of other vascular conduits, including autologous vein and synthetic grafts. The meta-analysis combing the V005 and V0l 7 trials showed a 30-day rate of death in ATEV patients of 3.5%, comparable to the 3.4% rate historically reported for synthetic grafts. There were no deaths attributable to the ATEV.

194. The foregoing statements in the November 21, 2024 Press Release were false and misleading because they failed to disclose to investors that the HAV was subject to serious health and safety concerns, including flaws in the underlying studies.

***December 19, 2024 Press Release***

195. On December 19, 2024, Humacyte issued a press release touting the benefits of the HAV (the "December 19, 2024 Press Release"). The December 19, 2024 Press Release stated, in relevant part:

> [Humacyte] today announced that the [FDA] has granted a full approval for SYMVESS (acellular tissue engineered vessel-tyod) for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and when autologous vein graft is not feasible.
>
> ***
>
> SYMVESS, or the ATEV™, is a first-in-class bioengineered human tissue that is designed to be a universally implantable vascular conduit for use in arterial replacement and repair. While harvesting vein from a trauma patient takes valuable surgical time, SYMVESS is available off-the-shelf, and does not require further injuring the patient to obtain vascular repair material. Humacyte's BLA included positive results from the V005 pivotal Phase 2/3 clinical study, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. SYMVESS was used to repair many types of traumatic injuries including car accidents, gunshot wounds, blast wounds, and industrial accidents. It was utilized by vascular and trauma surgeons in Level 1 Trauma centers throughout the U.S. and Israel to repair severe limb-threatening and life-threatening injuries, and in front-line hospitals in Ukraine to treat wartime injuries. Results from these studies were published in JAMA Surgery on November 20, 2024. In the civilian and military clinical studies, SYMVESS was observed to have high rates of patency, or blood flow, and low rates of amputation and infection.

196. The December 19, 2024 Press Release also quoted Defendant Niklason as stating, "SYMVESS approval in this first indication for arterial injury repair is a milestone for regenerative medicine overall, as well as for Humacyte. The FDA's full approval of SYMVESS is a transformational event for the Company and our bioengineering technology platform." These

statements were false and misleading because the press release failed to disclose that the HAV was subject to serious health and safety issues, including the risk of rupture and flaws in the underlying studies.

197. Specifically, the December 19, 2024 Press Release portrayed the FDA approval as an unqualified success while omitting that Humacyte's original BLA sought a substantially broader indication for the HAV, namely use "in urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible." The indication ultimately approved by the FDA was materially narrower, covering only "use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible."

198. The December 19, 2024 Press Release also failed to disclose the unusual post-marketing requirements and commitments imposed in connection with the FDA's approval, beyond those ordinarily associated with such approval. These requirements included, among other things: (i) prohibiting distribution of a product lot without a specific CBER release notification; (ii) expedited reporting of graft ruptures for three years; (iii) deferral of the pediatric study, subject to specified final protocol and report deadlines; (iv) a long-term observational study concerning the risks of graft failure; (v) a final report deadline for treatment of life- or limb-threatening vascular trauma by December 31, 2026; (vi) a PMC shipping-validation study to evaluate critical quality attributes of the HAV; (vii) an 18-month PMC leachables study to assess potential contaminants; and (viii) establishment and justification of updated acceptance criteria for product release. Taken together, these requirements and commitments reflected continuing FDA concerns regarding the HAV.

## <u>THE TRUTH IS FULLY REVEALED</u>

***March 24, 2025 New York Times Exposé Reveals FDA Safety and Efficacy Concerns***

199. On March 24, 2025, *The New York Times* published an investigative article (the "*NYT* Exposé") revealing that certain FDA staff members had determined that one of Humacyte's HAV studies was "severely lacking." The *NYT* Exposé further disclosed, *inter alia*, (i) inadequate four-month safety follow-up; (ii) the potential for fatal graft ruptures; (iii) the failure of the studies to satisfy the usual criteria for an adequate and well-controlled trial; (iv) that the HAV's success rate in its principal study was only 67%, rather than the 84% represented by the Individual Defendants; and (v) that an FDA medical-device reviewer had retired in protest over these concerns.

200. The *NYT* Exposé further revealed that the Individual Defendants had misrepresented the HAV's actual performance, safety, efficacy, and associated risks. The article stated, in pertinent part:

> When the biotech company Humacyte designed a study to see if its lab-grown blood vessel worked, it decided to measure whether blood was flowing freely through the high-tech tube 30 days after it was implanted in a person.
>
> As those days passed, some of the 54 patients in the study ran into trouble. Doctors lost track of one. Four died. Four more had a limb amputated, including one who developed a clot and infection in the artificial vessel, [FDA] records show.
>
> Humacyte, which is traded on the Nasdaq, counted all those patients as proof of success in talks with investors and in an article in JAMA Surgery.

201. The *NYT* Exposé also reported that two FDA reviewers had raised concerns regarding the HAV's safety. Specifically, the article disclosed:

> Before the vessel was approved, one [FDA] medical reviewer pointed out that 37 of the 54 patients were not assessed in a safety check four months after getting the implant, with many dead or lost to follow-up. "There is significant uncertainty regarding the safety and effectiveness of this product beyond 30 days," the [FDA]. report says.

> Dr. Robert E. Lee, a vascular surgeon who cared for gunshot-wounded patients in Detroit for 30 years, retired in the fall from the [FDA] in protest over the matter. In a review of more than 2,000 pages of company records conducted when he was an [FDA] medical officer, Dr. Lee found that the vessel could rupture with no warning. Those events were "unpredictable, catastrophic and life-threatening," he wrote in his [FDA] review, parts of which were made public weeks ago.

202. Dr. Lee further characterized the risk of HAV rupture as "unacceptable ... for whatever slim benefit, if any, this product provides above the current standard treatments." The *NYT* Exposé also reported that Dr. Lee unsuccessfully sought to have the FDA convene a public advisory committee to address concerns regarding the HAV study:

> Dr. Lee failed to persuade top [FDA] officials to hold a public advisory committee meeting where the study results could be discussed and reviewed by independent experts. The agency decided instead to send records to three external reviewers, who in turn identified failure of the Humacyte vessels "as a serious risk," but added that "the appropriate patient population" would benefit, according to documents.

203. The *NYT* Exposé additionally identified concerns regarding representations made in the *JAMA Surgery* article entitled "Bioengineered Human Arteries for the Repair of Vascular Injuries." The *NYT* Exposé explained:

> The article reported that the Humacyte vessel "demonstrates improved outcomes" compared with other artificial vessels and that Symvess "provides benefits" in "infection resistance." According to the FDA's review, however, there was no clinical evidence establishing such an additional benefit.

204. Finally, the *NYT* Exposé discussed the critical assessment by an FDA statistician of the clinical data Humacyte submitted in support of approval. The article reported:

> Thomas Zhou, a biostatistician in the biologics division of the [FDA], also flagged concerns from the U.S. arm of the study and the data from Ukraine.
>
> "Neither study met the usual criteria for an adequate and well-controlled trial," he wrote.
>
> The study of 16 patients treated in Ukraine was retrospective and observational, meaning researchers could look back at a larger pool of data and select the best cases. It showed "limited support of efficacy," partly because the injuries were

> "skewed to shrapnel injuries" and not the devastating wounds typically seen on the battlefield, he said.
>
> The U.S. study was "poorly conducted" and underwent "multiple major changes" during the trial, the statistical review said. The records also show that [FDA] scientists dismissed as successful the patient deaths and amputations, citing a lack of information or imaging studies.

***March 25, 2025 Bloomberg Article***

205. On March 25, 2025, *Bloomberg* published an article reporting that an FDA reviewer had concluded that Humacyte's two clinical trials could not properly be combined and that Humacyte had repeatedly sought to modify its clinical studies while they were ongoing. The article further reported concerns regarding the HAV's safety, including the identified "serious risk" of product failure and the conclusion that the product had not "demonstrate[d] superiority to existing treatment options."

206. Also on March 25, 2025, Humacyte announced the pricing of a public offering of 25 million shares. The final prospectus set the offering price at $2.00 per share, substantially below the $2.86 closing price earlier that day.

207. Following these disclosures, Humacyte's common stock declined from $3.32 per share at the close of trading on March 24, 2025 to $2.88 per share at the close on March 25, 2025, a decline of approximately 13%. The stock then fell an additional approximately 31%, closing at $2.00 per share on March 26, 2025.

**THE SECURITIES CLASS ACTION**

208. Based on similar allegations as made herein, the Securities Class Action was filed in the United States District Court for the Middle District of North Carolina against the Company, and Defendants Niklason, Prichard, and Sander. On March 31, 2026, the Honorable Thomas D. Schroeder denied defendants' Motion to Dismiss in part, finding that plaintiffs had adequately

alleged that the defendants had made materially false and misleading statements about the safety of the HAV. Order at *49. Moreover, plaintiffs had also established scienter as to both concerns over the safety of the HAV and the resulting delay in FDA approval, as well as to various stock transactions made by defendant Niklason, Prichard, and Sander during the Relevant Period. Id. at *49–55.

## INSIDER SALES

209. Rather than disclose material information to the market, Defendants Dougan, Prichard, Sander, and Sebelius (the "Insider Selling Defendants") used their access to Humacyte's material nonpublic information to sell their personal holdings while the Company's stock remained artificially inflated. As directors and officers, the Insider Selling Defendants were entrusted with, and had access to, material, nonpublic information concerning Humacyte's true business prospects.

210. While in possession of material nonpublic information, Defendant Dougan sold over 8.2 million shares of Humacyte stock, primarily through Ayabudge, for proceeds of almost $39 million before the truth emerged. These sales were timed to capitalize on Humacyte's artificially inflated stock price.

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/31/24 | 716,573 | $7.78 | $5,574,937.94 |
| 5/31/24 | 93,213 | $8.93 | $832,392.09 |
| 6/3/24 | 190,214 | $7.42 | $1,411,387.88 |
| 6/4/24 | 1,852 | $7.28 | $13,482.56 |
| 6/11/24 | 282,000 | $7.10 | $2,000,000.40 |
| 6/11/24 | 76,630 | $7.02 | $537,942.60 |
| 6/12/24 | 271,518 | $7.03 | $1,982,081.40 |
| 8/27/24 | 252,676 | $6.71 | $1,695,455.96 |
| 8/28/24 | 277,090 | $6.47 | $1,792,772.30 |
| 8/29/24 | 352,112 | $6.35 | $2,235,911.20 |
| 9/9/24 | 157,704 | $5.42 | $854,755.68 |
| 9/10/24 | 288,674 | $5.23 | $1,509,765.02 |
| 11/18/24 | 811,172 | $4.44 | $3,601,603.68 |

| | | | |
|---|---|---|---|
| 11/19/24 | 427,459 | $4.34 | $1,855,172.06 |
| 11/20/24 | 261,369 | $4.40 | $1,150,023.60 |
| **Total** | **8,259,852** | | **$38,986,521.49** |

211. Notably, in the Securities Class Action, Judge Schroeder found that the timing and amount of Defendant Niklason's stock transactions lend support to an inference of scienter. Order at *52.

212. While in possession of material nonpublic information, Defendant Prichard sold approximately 191,511 shares of personally held Humacyte stock for proceeds of more than $1.56 million before the truth emerged. These sales were timed to capitalize on Humacyte's artificially inflated stock price.

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/30/24 | 61,941 | $7.71 | $477,565.11 |
| 5/30/24 | 78,779 | $8.36 | $658,592.44 |
| 5/30/24 | 48,166 | $8.32 | $400,741.12 |
| 5/31/24 | 2,625 | $9.41 | $24,706.50 |
| **Total** | **191,511** | | **$1,561,605.17** |

213. Notably, in the Securities Class Action, Judge Schroeder found that the timing and amount of Defendant Prichard's stock transactions lend support to an inference of scienter. Order at *53.

214. While in possession of material nonpublic information, Defendant Sander sold approximately 38,389 shares of personally held Humacyte stock for proceeds of approximately $263,000 before the truth emerged. These sales were timed to capitalize on Humacyte's artificially inflated stock price.

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/27/24 | 39,389 | $6.68 | $263,118.52 |
| **Total** | **39,389** | | **$263,118.52** |

215. Notably, in the Securities Class Action, Judge Schroeder found that the timing and amount of Defendant Sander's stock transactions lend slight support to an inference of scienter. Order at *54.

216. While in possession of material nonpublic information, Defendant Sebelius sold approximately 5,182 shares of personally held Humacyte stock for proceeds of approximately $28,000 before the truth emerged. These sales were timed to capitalize on Humacyte's artificially inflated stock price.

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 9/10/24 | 3,634 | $5.41 | $19,659.94 |
| 9/10/24 | 1,548 | $5.39 | $8,343.72 |
| **Total** | **5,182** | | **$28,003.66** |

217. In total, the Insider Selling Defendants sold close to $41 million worth of Humacyte stock at artificially inflated prices, while in possession of material, non-public information.

**DAMAGES TO HUMACYTE**

218. As a direct and proximate result of the Individual Defendants' misconduct, Humacyte has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

219. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action, as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

220. These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

221. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

222. As a direct and proximate result of the Individual Defendants' actions, Humacyte has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

223. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

224. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

225. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

226. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

227. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

228. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

229. The Company's Board is currently comprised of eleven members: Defendants Sebelius, Bamforth, Brown, Constantino, Dougan, Green, Jones, Niklason, Seimetz, Wallace, and Windham-Bannister (the "Demand Director Defendants"). Thus, Plaintiff is only required to show that a majority of the Demand Director Defendants, i.e., 6, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

230. Each of the Demand Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

231. Each of the Demand Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

232. Additionally, the Demand Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Dougan**

233. Defendant Dougan is not disinterested or independent, and therefore, is incapable of considering demand because, *inter alia*, he is married to Defendant Niklason, who is also named as a defendant in the Securities Class Action. Dougan therefore cannot exercise disinterested or independent judgment when considering a demand to investigate and prosecute the claims asserted herein against his wife, making him not disinterested or independent.

234. Pursuant to the Company's filings with the SEC, Defendant Dougan is not considered an independent Director.

**Defendant Niklason**

235. Defendant Niklason is not disinterested or independent, and therefore, is incapable of considering demand because, Niklason, as President and CEO of the Company, is an employee who derives substantial compensation in her role with the Company making her not disinterested or independent.

236. The financial benefits received by Defendant Niklason renders her incapable of impartially considering a demand to commence and vigorously prosecute this action.

237. Furthermore, Defendant Niklason is not disinterested or independent, and therefore, is incapable of considering demand because, *inter alia*, she is married to Defendant Dougan.

238. Pursuant to the Company's filings with the SEC, Defendant Niklason is not considered an independent Director.

239. As such, Defendant Niklason cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, as that would expose her to substantial liability and threaten her livelihood.

**Defendants Constantino, Sebelius, and Windham-Bannister**

240. Defendants Constantino (Chair), Sebelius, and Windham-Bannister are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge, these Defendants caused these improper statements.

241. For these reasons, Constantino, Sebelius, and Windham-Bannister breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendants Dougan, Prichard, Sander, and Sebelius**

242. Defendants Dougan, Prichard, Sander, and Sebelius are not disinterested or independent and, therefore, are incapable of considering demand because while in possession of material, non-public information, they sold 8.2 million, 191,511, 38,389, and 5,182 shares of the Company's stock at various prices per share for a windfall of nearly $41 million collectively, and these sales demonstrate their motives in facilitating and participating in the misleading statements. As a result of their insider selling, Dougan, Prichard, Sander, and Sebelius may be personally subject to disgorgement, and thus demand upon them is futile and, therefore, excused.

**All Demand Director Defendants**

243. The Demand Director Defendants, as members of the Board, were and are subject to the Code of Business Conduct and Ethics as well as the Company's Corporate Governance Guidelines (the "Codes"), which go well beyond the basic duties required by applicable laws, rules, and regulations. Specifically, the Codes require Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Demand Director Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the DemandDirector Defendants breached the Company's Codes, face substantial liability, and are not independent or disinterested, making demand upon them futile.

244. Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Demand Director Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Demand Director Defendants from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Demand Director Defendants would be futile.

245. Humacyte has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Humacyte any part of the damages Humacyte suffered and will continue to suffer, thereby. Thus, any demand to the Demand Director Defendants would be futile.

246. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Demand Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Demand Directors Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

247. The acts complained of herein constitute violations of fiduciary duties owed by Humacyte's officers and directors, and these acts are incapable of ratification.

248. The Demand Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Humacyte. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Humacyte, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage,

if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Demand Director Defendants is futile and, therefore, excused.

249. If there is no directors' and officers' liability insurance, then the Directors will not cause Humacyte to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

250. Thus, for all of the reasons set forth above, all of the Demand Director Defendants, and, if not all of them, certainly at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## COUNT I

**Against the Individual Defendants**
**For Breach of Fiduciary Duties**

242. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

243. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Humacyte's securities.

244. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

245. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Humacyte has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

246. Plaintiff, on behalf of Humacyte, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Violating Section 14(a) of the Exchange Act

247. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

248. Pursuant to Section 14(a) of the Exchange Act, "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

249. Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits proxy statements from containing "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

250. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

251. The false and misleading Proxy statements caused the re-election of several Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to Humacyte.

252. As a direct and proximate result of the material misrepresentations and omissions in the Proxy Statements filed during the Relevant Period by the Individual Defendants, the Company suffered damages.

253. Plaintiff, on behalf of Humacyte, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duty – Misappropriation of Material, Non-Public Information Against the Insider Selling Defendants

254. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

255. At the time that the Insider Selling Defendants sold their Humacyte stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

256. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary

asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Humacyte stock.

257. The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

258. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, any profits made by the Insider Trading Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of constructive trust on any profits the Insider Trading Defendants obtained thereby.

## COUNT IV

### Against the Individual Defendants For Unjust Enrichment

259. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

260. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information and facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Humacyte.

261. Each of the Defendants received payment from Humacyte, in the form of either salary or director fees while actively breaching their fiduciary duties to Humacyte.

262. All the payments and benefits provided to Defendants were at the expense of Humacyte. The Company received no benefit from these payments.

263. Plaintiff, as a shareholder and a representative of Humacyte, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including

from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

264. Plaintiff, on behalf of Humacyte, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants For Waste of Corporate Assets

265. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

266. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Humacyte to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

267. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that the Plaintiff may maintain this action on behalf of Humacyte and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Humacyte;

c) Determining and awarding to Humacyte the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve Humacyte's corporate governance and internal procedures to comply with applicable laws and to protect Humacyte and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 21, 2026

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
rernst@bk-legal.com

-and-

JUSTIN A. KUEHN
MOLLY J. BROWN
**KUEHN LAW, PLLC**
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
justin@kuehn.law
molly@kuehn.law

*Co-Counsel to Gregory Sammons*